Filed 7/28/22  McNamee v. City of L.A. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GREG McNAMEE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>    Defendant and Respondent. | B304713<br><br>(Los Angeles County<br>Super. Ct. No. BC652917) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Judge.  Affirmed.

McNicholas & McNicholas, Douglas D. Winter and Jeffrey R. Lamb for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Scott Marcus and Blithe S. Bock, Assistant City Attorney, and Shaun Dabby Jacobs, Deputy City Attorney, for Defendant and Respondent.

\* \* \* \* \* \*

Greg McNamee (plaintiff) sued the City of Los Angeles (the City), alleging four employment-related claims against the Los Angeles Police Department (the Department). Two of those claims were dismissed on the pleadings; the other two, on summary judgment. Plaintiff argues that the trial court erred in its summary judgment ruling. We conclude there was no error, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts[1]

#### A. *Plaintiff's employment*

In February 1999, the Department hired plaintiff as a police officer.

In 2009, plaintiff joined the Department's Major Crimes Division (Major Crimes) as a detective. Detectives in Major Crimes are "responsible for preventing significant disruptions of public order in the City [of Los Angeles]" and often "work in an undercover capacity, gathering intelligence for counter-terrorism operations." Major Crime's operations are both "confidential" and "sensitive."

By 2013, plaintiff's immediate supervisor in Major Crimes was Detective Johnny Smith (Smith).

At that time, plaintiff was doing undercover work.

#### B. *Plaintiff's prior injury and relapse*

In April 2004, plaintiff injured his neck and back while on the job. Specifically, he had a physical altercation with a

---

[1]     We note that plaintiff's brief cites evidence favorable to him that the trial court excluded, and that plaintiff does not contend was improperly excluded. We disregard such evidence, and note that plaintiff's inappropriate attempt to misstate the pertinent record below does not go unnoticed.

combative suspect.  The injury necessitated neck surgery, and plaintiff was on medical leave until March 2005.

In February 2013, this prior injury flared up.  Plaintiff resumed physical therapy, but Smith required him on several occasions to reschedule the physical therapy sessions because they interfered with the needs of Major Crimes, even though the Department typically allowed officers injured on the job to schedule their related medical appointments during working hours.

### C.     *Medical leave of absence*

On July 8, 2013, a physician monitoring the resurgence of plaintiff's injury declared him to be "physically unable to perform the essential functions" of his job at that time, which rendered plaintiff "temporarily totally disabled."  Plaintiff took a medical leave of absence, for which he continued to receive his regular salary except during a 7-month period when the Department inadvertently failed to pay his salary.

### D.     *Plaintiff's unreported work and income*

While plaintiff was on this leave of absence, he started working as a paid "extra" for movies, music videos, and commercials.  He got paid a total of $3,747.50 for this work.

Plaintiff's paid employment implicated two Department policies—namely, (1) the policy requiring Department employees who are on paid medical leave as temporarily totally disabled to obtain a work permit from the Department before taking any other employment, and (2) the policy requiring those persons to report any income they make from such employment.  Plaintiff acknowledged receipt of documents setting forth these policies.  Plaintiff was also aware of these policies, as he had requested

3

and obtained a work permit to work as a martial arts instructor while on leave.

Plaintiff nevertheless violated those policies. He never obtained a permit to work as an extra. Plaintiff also never reported any of his supplemental income to the Department.

**E.**   *Smith reports plaintiff's possible violation of Department policy*

Plaintiff posted news of his supplemental employment on his Facebook page by posting videos or images of himself in a commercial featuring him riding a motorcycle. Because plaintiff had previously invited Smith and other officers to be his "Facebook friends," they saw his posts. Because these posts indicated that plaintiff may have been "working while on [temporarily totally disabled]" status in violation of the Department's policies, Smith reported the potential violation to the Department's Internal Affairs Division (Internal Affairs).

Internal Affairs opened an investigation into three counts of misconduct by plaintiff: (1) he had not obtained a permit to work as an "extra" while on paid medical leave, (2) he had not reported the income he earned from that work, and (3) he had made a false statement during the April 2014 deposition when he testified under oath that he *did* have the required permit. The investigation was independently conducted by the Workers Compensation Fraud Unit of Internal Affairs, and was lead by Sergeant Wai Wong (Wong). Although Smith was interviewed a few times during the course of the investigation, he did not direct the investigation.

While the investigation was ongoing, the Department between July 2013 and January 2014 erroneously failed to pay

4

plaintiff his salary. Once the Department realized its error, it made up those payments.

On April 1, 2015, Internal Affairs issued a report containing the allegations of plaintiff's misconduct and summarizing the results of the investigation. Internal Affairs sent this report to the Commander of Major Crimes at the time, Captain Steven Sambar (Sambar). On April 30, 2015, Sambar sustained the allegations based on the facts set forth in the investigative report, and recommended that plaintiff be sent to the Board of Rights with a recommended penalty of termination if he was guilty.

### F.    *Plaintiff returns to work in May 2015*

On May 17, 2015, plaintiff returned to work at the Department and met with Sambar, his new supervisor.

At that meeting, Sambar informed plaintiff of the Internal Affairs report, of Sambar's own recommendation, and that the matter would next be reviewed by the Board of Rights.

Plaintiff responded by telling Sambar, for the first time, that Smith had engaged in disability discrimination against him back in 2013.

On June 8, 2015, plaintiff was placed on involuntary leave pending the Board of Rights hearing.

### G.    *The Board of Rights hearing*

In December 2015, the Board of Rights held a hearing regarding the three alleged violations of Department policy. Plaintiff pled guilty to the first two violations—namely, that (1) he had not obtained the necessary permit to work as an "extra," and (2) he had not reported any of the income he earned from this supplemental work.

5

Plaintiff contested the third violation that he had made a false statement during the April 2014 deposition. The Board of Rights acquitted plaintiff of that violation, reasoning that plaintiff's statement that he *did have* a work permit was due to a "miscommunication and/or misunderstanding rather than untruthfulness" and that plaintiff lacked "specific intent" to be deceptive.

In fixing the appropriate discipline for the two admitted violations, the Board of Rights balanced plaintiff's "honest[y] and forthright[ness] during th[e] hearing" and his willingness to "acknowledg[e]" his violation of Department policy that required obtaining a work permit and reporting the resulting income against the fact that those violations constituted "serious charges [that] can be attributed to violations of [the Department's] code of ethics and even malfeasance."

The Board of Rights accordingly imposed a 10-day suspension on plaintiff.

### H. *Plaintiff's transfer out of Major Crimes*

After the Board of Rights issued its ruling, Sambar met with plaintiff and informed him that he no longer wanted plaintiff to serve in Major Crimes because, in Sambar's view, plaintiff's "admitted misconduct" raised "issues" regarding his "integrity to do the right thing [and] follow policies and procedures," which Sambar viewed as critical for officers working the sensitive assignments typical of Major Crimes. Plaintiff responded by accusing Sambar of having "integrity issues" and accusing Sambar of being motivated—not by plaintiff's admitted misconduct—but rather by an intent to discriminate against him due to his disability and an intent to retaliate against plaintiff for reporting Smith's disability discrimination from 2013.

6

Plaintiff initially took Sambar's suggestion to request a transfer out of Major Crimes, but subsequently withdrew that request.

In February 2016, Sambar transferred plaintiff out of Major Crimes and into a Detective Unit in the Topanga Division in light of his stated concerns about plaintiff's "lack of integrity." This was a lateral transfer, as plaintiff retained his rank, pay, and benefits, but was perceived as a "step down" because it was a transfer out of the more prestigious Major Crimes unit.

### I.    *Plaintiff files an administrative complaint*

On March 9, 2016, plaintiff filed a complaint with the California Department of Fair Employment and Housing. In that administrative complaint, plaintiff alleged that he had a "medical condition for which he was subjected to discrimination, harassment, and retaliation by [the Department] includ[ing] but not limited to . . . Sambar." "As a result of [d]efendants [*sic*] actions," the complaint continued, "[p]laintiff was forced to go through a Board of Rights to defend against a bogus allegation which he prevailed on" and was "involuntarily transferred."

### J.    *Postcomplaint events*

After plaintiff filed his administrative complaint, he was transferred to a lateral position in the Detective Unit of the Topanga Division. He applied for a handful of promotions, but was unsuccessful. He also underwent additional surgeries on his neck and back, but was not reimbursed for that surgery by the department until 2018.

7

## II.    Procedural Background

On March 9, 2017, plaintiff sued the City.  Over the next 20 months, plaintiff filed five amended complaints.[2]

In the operative, fifth amended complaint, plaintiff alleges that the City (through the Department) (1) engaged in discrimination "commencing in 2013" on the basis of disability, (2) engaged in retaliation "commencing in 2015" in response to plaintiff's reporting of the prior disability discrimination, (3) failed to accommodate his disability, and (4) failed to engage in the interactive process.  These claims, Plaintiff alleges, violate California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.).[3]

The trial court sustained a demurrer without leave to amend to plaintiff's claims for the failure to accommodate and failure to engage in interactive process.

In July 2019, the City moved for summary judgment on the two remaining claims of disability discrimination and retaliation. After further briefing and a hearing, the trial court granted summary judgment to the City on both claims.

After judgment was entered, plaintiff filed this timely appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in granting summary judgment on his discrimination and retaliation claims.

---

[2]    The trial court sustained demurrers to various claims in the third and fourth amended complaints, but did so with leave to amend.

[3]    All further statutory references are to the Government Code unless otherwise indicated.

8

## I.    Governing Law

### A.    *Regarding summary judgment, generally*

A trial court errs in granting summary judgment if there are "genuine" or "triable" issues of fact to be resolved at trial—that is, if "the evidence would allow a reasonable trier of fact to find . . . in favor of the party opposing the [summary judgment] motion."  (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 (*Serri*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845; see *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 365.)  We independently review a trial court's summary judgment ruling, without regard to its reasoning.  (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 444.)  In so doing, we may not weigh conflicting evidence or assess the credibility of witnesses (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 319 (*Sandell*)), and must resolve any doubts against summary judgment and in favor of trial (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415).

### B.    *Regarding FEHA*

Among other things, FEHA makes it unlawful "[f]or an employer" (1) "because of . . . physical disability . . . to discriminate against [a] person in compensation or in terms, conditions, or privileges of employment" (that is, to discriminate), and (2) "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under" FEHA (that is, to retaliate).  (§ 12940, subds. (a) & (h).)

In evaluating such discrimination and retaliation claims under FEHA, California uses a burden-shifting mechanism.  The plaintiff-employee must first establish a prima facie case of discrimination or retaliation.  (*Guz v. Bechtel National, Inc.*

9

(2000) 24 Cal.4th 317, 354-355 (*Guz*); *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)  If he makes out a prima facie case, then it is rebuttably presumed that the employer engaged in discrimination or retaliation, and the burden shifts to the employer to set forth a legitimate nondiscriminatory or nonretaliatory reason for the "adverse employment action" the plaintiff-employee asserts he has suffered as a result of the discrimination or retaliation.  (*Guz*, at pp. 355-356; *Yanowitz*, at p. 1042.)  If the employer sets forth such a reason, then burden "shifts back to the employee to prove" either ""'intentional discrimination"'" or "intentional retaliation." (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 965; *Yanowitz*, at p. 1042.)

This burden-shifting mechanism works differently when evaluating a summary judgment motion.  (*Serri*, *supra*, 226 Cal.App.4th at p. 861.)  Where, as here, the employer is the movant for summary judgment, the employer bears the initial burden to disprove an element of the plaintiff-employee's prima facie case or to adduce evidence supporting a legitimate, nondiscriminatory or nonretaliatory reason for its adverse employment action.  (*Id.*; *Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 741 (*Cheal*).)  If it does so, then the burden shifts to the plaintiff-employee to produce "substantial responsive evidence" that (1) "'the employer's stated reasons were untrue or pretextual,'" or (2) "'the employer acted with a discriminatory [or retaliatory] animus.'" (*Serri*, at p. 862, quoting *Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038, italics omitted; see also *Guz*, *supra*, 24 Cal.4th at p. 357; *Choochagi v. Barracuda Networks, Inc.* (2020) 60 Cal.App.5th 444, 457.)  For these purposes, the plaintiff-employee's "responsive" evidence is

10

"substantial" only if it "'permit[s] a rational inference that the employer's actual motive was discriminatory [or retaliatory].'" (*Serri*, at pp. 861-862, quoting *Guz*, at p. 361; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715 [no "substantial" evidence where "employee's showing . . . is too weak to sustain a reasoned inference in the employee's favor," italics omitted]; *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94 [same].) A rational inference is based on "'specific'" evidence, and hence ""'based on more than mere speculation, conjecture, or fantasy.""" (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1537; *Batarse v. Service Employees Internat. Union, Local, 1000* (2012) 209 Cal.App.4th 820, 834.)

## II. Analysis

### A. *Disability discrimination claim*

A prima face case of discrimination under FEHA requires the plaintiff-employee to produce evidence showing that "(1) he was the member of a protected class, (2) he was qualified for the position he sought [to maintain] . . . , (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.) More specifically, a prima face case of *disability* discrimination under FEHA requires evidence showing that the plaintiff-employee (1) suffers from a physical disability, (2) was otherwise qualified to do his job, with or without reasonable accommodation, and (3) was subjected to adverse employment action because of his disability. (*Green v. State of California* (2007) 42 Cal.4th 254, 262; *Castro-Ramirez v. Dependable Highway Express, Inc.* (2016)

11

2 Cal.App.5th 1028, 1037; *Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886.)

Over the course of this case, plaintiff has asserted that he has suffered five different "adverse employment actions" due to disability discrimination, but only two are properly before us now—namely, (1) Smith's act, in 2013, of initiating the Internal Affairs investigation into potential violations of the Department policies against unpermitted extracurricular work and unreported extracurricular income while out on paid disability leave, and (2) Sambar's act, in February 2016, of involuntarily transferring plaintiff out of Major Crimes. The other three are (1) Smith's actions in not allowing plaintiff to attend physical therapy sessions during work hours despite Department rules that normally so allow,[4] (2) the Department's failure to pay plaintiff's salary from June 2013 to July 2014, and (3) plaintiff's failure to obtain any of the positions he sought after he filed his administrative complaint. But these three alleged adverse employment actions are not before us: Smith's failure to accommodate plaintiff's request for time during work hours to attend physical therapy constitutes a failure to accommodate, which is *not* an adverse employment action (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 735-736 ["No court has ever held that a failure to reasonably accommodate an employee's disability . . . can qualify as the adverse action underlying a discrimination or retaliation claim."]; cf. *Zamora v. Security Industry Specialists, Inc.* (2021) 71

---

[4] Plaintiff also alleges that Smith "badgered" him about his disability, but that was only in relation to not being granted time off during work hours to attend physical therapy; it did not constitute an independent adverse employment action.

12

Cal.App.5th 1, 39-40 [failure to accommodate may be relevant to show that plaintiff could perform essential duties of job without reasonable accommodation]); the trial court struck as speculative the sole evidence connecting Smith to the Department's error in not paying his salary, and plaintiff has not challenged that ruling (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1452 (*Pipitone*)); and plaintiff has disavowed on appeal any reliance on his postcomplaint lack of success in moving within the Department.

On summary judgment, the City bore the initial burden to prove that it had a legitimate, nondiscriminatory reason for Smith's 2013 act of initiating the Internal Affairs investigation and Sambar's 2016 act of involuntarily transferring plaintiff out of Major Crimes. The City carried this burden by proffering evidence that it took these actions because it reasonably suspected—and subsequently confirmed, by plaintiff's own admission, no less—that plaintiff had violated Department policy in not obtaining a work permit for his extracurricular activities while he was on paid medical leave and in not reporting the income he earned from those activities. Plaintiff's Facebook post about his work as an "extra," coupled with the absence of any work permits on file, certainly gave Smith ample reason to suspect plaintiff might be violating Department policy. That was sufficient to initiate an investigation. And although, to justify the 2016 transfer, the City need only have shown that it had a "'good faith belief that [its] employee violated a workplace rule'" (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1223), by the time Sambar acted, the City also had plaintiff's own admission and a Board of Rights finding of guilt based on that admission.

13

Thus, the propriety of the trial court's grant of summary judgment on plaintiff's discrimination claim turns on whether plaintiff adduced "'substantial responsive evidence'" that (1) the City's stated reason was "untrue or pretextual," or (2) the City otherwise "acted with a discriminatory animus." (*Serri*, *supra*, 226 Cal.App.4th, at p. 862.) The showing that a plaintiff must make at this stage is more onerous than what a plaintiff must show to make out his prima facie case. (*Godwin v. Hunt Wesson, Inc.* (9th Cir. 1998) 150 F.3d 1217, 1220; *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 352 (*Arteaga*).) Plaintiff has not carried this burden.

Plaintiff has not adduced any evidence that the City's stated reason for its actions—that plaintiff had violated Department policies—was untrue or pretextual. Nor could he, as he *admitted* to those violations. Although plaintiff repeatedly asserts that the Board of Rights "exonerated" him, he is simply wrong: The Board of Rights may have "acquitted" him of the more aggravated allegation that he made a false statement, but it convicted him of the allegations—based on his own admission— that he violated two Department policies that the Board itself stated were "serious charges," "a violation of [the Department's] code of ethics," and "malfeasance." Because an employer's "loss of confidence in an employee is a legitimate, nondiscriminatory reason" (*Arteaga*, *supra*, 163 Cal.App.4th at p. 352), Sambar's concern about plaintiff's integrity is both legitimate and nondiscriminatory as to whether plaintiff should remain in a highly sensitive position within law enforcement like Major Crimes. (Accord, *Talmo v. Civil Serv. Comm.* (1991) 231 Cal.App.3d 210, 231 ["credibility and temperament are crucial to the proper performance of a[ police] officer's duties"].)

14

Plaintiff has also not adduced specific evidence that the City otherwise acted with a discriminatory animus.

There is insufficient evidence to create a triable issue of fact as to whether Smith's conduct in initiating the Internal Affairs investigation in 2013 was motivated by a desire to discriminate against plaintiff due to his disability. Most fundamentally, Smith's referral initiating that investigation was not an act undertaken to punish plaintiff *for being disabled*; instead, it was undertaken because Smith had reason to believe that plaintiff was violating the Department's policies and also that plaintiff was potentially overstating the extent of his injuries. This is not disability discrimination. (E.g., *Oehmke v. Medtronic, Inc.* (8th Cir. 2016) 844 F.3d 748, 755, fn. 3 (*Oehmke*) [employer's concern that employee "may have been lying about [disability] . . . shows [the employer] might have targeted [the employee] because she believed [the employee] was untruthful, not because of her disability]".) If such actions constituted disability discrimination, then employers could not investigate potential worker's compensation fraud without violating FEHA; we decline to construe FEHA in a way that would create a disincentive to investigate and halt worker's compensation fraud. Plaintiff alternatively proffers an alternative reading of the record—namely, that (1) Smith's initial referral to Internal Affairs dealt solely with plaintiff's conduct in riding a motorcycle in a manner inconsistent with plaintiff's disability; and (2) Internal Affairs did not look into plaintiff working without a permit until a separate referral was made in April 2014. This proffered alternative misreads the record. It is undisputed that Smith made a referral to Internal Affairs in August 2013 because he saw plaintiff "*[in] a commercial* . . . with a rifle or on a

15

motorcycle." (Italics added.) Plaintiff counts that Wong, the Internal Affairs officer, testified that Smith's initial referral dealt with "an employee engaging in activities . . . inconsistent with" his reported disability and that the referral involved "riding a motorcycle." But this testimony is wholly consistent with the basis for Smith's referral and cannot be read to create a factual dispute as to the basis for Smith's August 2013 referral. What is more, the April 2014 referral was based on plaintiff's conduct in allegedly *lying* about having a work permit during a deposition.

Plaintiff points to the evidence that Smith was telling others around the Department that plaintiff was faking his injuries; plaintiff urges that this is "direct evidence" of discriminatory animus, and notes that "'"very little" direct evidence of [an] employer's discriminatory intent'" "'is required'" "'to move past summary judgment.'" (*Morgan v. Regents of Univ. of California* (2000) 88 Cal.App.4th 52, 69.) This evidence does not create a triable issue of fact because (1) it was excluded as speculative and plaintiff has not challenged that exclusion (*Pipitone*, *supra*, 244 Cal.App.4th, at p. 1452), (2) it evinces a *disbelief* as to the extent of plaintiff's injury and a concern about fraud, not discrimination on the basis of plaintiff's disability (*Oehmke*, *supra*, 844 F.3d at p. 755, fn. 3), and (3) an employer can rebut even direct evidence of discriminatory animus by "proving the plaintiff would have been subject to the same employment decision without reference to the unlawful factor" (*Morgan*, at pp. 67-68), and here it is clear that plaintiff would have been investigated and transferred due to his admitted misconduct regardless of anything Smith said or did back in 2013. What is more, the evidence in the record indicates that Smith did not contact Internal Affairs until several weeks after

16

plaintiff went on paid leave, but did so *immediately* after he saw plaintiff's Facebook post detailing his work as an "extra"; given this timing, the inference that Smith's report to Internal Affairs was motivated by anything but a concern that plaintiff was violating the rules is "too weak" to overcome summary judgment.

There is also insufficient evidence to create a triable issue of fact as to whether Sambar's conduct in transferring plaintiff out of Major Crimes in 2016 was motivated by an intent to discriminate against plaintiff on the basis of his disability. While Sambar was obviously aware of plaintiff's time away on paid medical leave, there is no evidence that Sambar said anything negative about plaintiff's disability or otherwise harbored any animus on that basis. Sambar did not even learn of *Smith*'s comments to plaintiff until plaintiff told Sambar about them in May 2015, which was *after* Sambar had already completed his review of the Internal Affairs report and concluded that plaintiff had committed three violations and should be terminated. What is more, there is no evidence that Smith had anything to do with the Internal Affairs investigation he spawned, had any influence or connection to Sambar, or influenced in any way the Board of Rights investigation; instead, plaintiff's conduct was at each step *independently* evaluated by the Internal Affairs officers, Sambar, and the Board of Rights. (Cf. *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 109 [no liability if actor with animus did not "contribute[] materially" to an adverse employment decision]; *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 429 [same]; *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1188-1189 [same].) Thus, there is no way Sambar could have been acting as a hapless "cat's paw" as part of a scheme masterminded by Smith. What is more, Sambar's

17

decision to involuntarily transfer plaintiff was based upon the Board of Rights' findings, which independently validate Sambar's justification for the transfer—namely, that plaintiff had "integrity issues." (*Joaquin, supra*, 202 Cal.App.4th at p. 1228 ["the board of rights hearing is a de novo proceeding" and trier of fact "could not reasonably have concluded that the board of rights itself harbored any retaliatory animus against [the employee]"].) As noted above, such integrity issues provide an ample, nondiscriminatory basis for the transfer.

### B. *Retaliation claim*

A prima face case of retaliation under FEHA requires the plaintiff-employee to produce evidence showing that "(1) he . . . engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra*, 36 Cal.4th at p. 1042.) The sole theory underlying plaintiff's retaliation claim is that Sambar recommended terminating him in April 2015 and thereafter involuntarily transferred him in February 2016 in retaliation for (1) plaintiff telling Sambar that *Smith* had engaged in disability discrimination, and (2) plaintiff accusing *Sambar* of himself engaging in disability discrimination by refusing to view his guilty pleas to two counts of misconduct as an "exonerat[ion]."

On summary judgment, the City bore the initial burden of proving a legitimate, nonretaliatory reason for recommending his termination and then involuntarily transferring him. The City carried this burden. Sambar could not have recommended termination on April 30, 2015, as a means of retaliating against plaintiff for reporting how Smith discriminated against him. That is because it is undisputed that plaintiff did not bring

18

Smith's alleged disability discrimination to Sambar's attention until nearly three weeks later, during their May 17, 2015, meeting. And Sambar's involuntary transfer came after the Board of Rights hearing and plaintiff's plea to the two counts of misconduct that Sambar cited in support of his concern that plaintiff had "integrity issues."

Thus, the propriety of the trial court's grant of summary judgment on plaintiff's retaliation claim turns on whether plaintiff adduced "'substantial responsive evidence'" that (1) the City's stated reason was "untrue or pretextual," or (2) the City otherwise "acted with a [retaliatory] animus." (*Serri, supra*, 226 Cal.App.4th, at p. 862.)

Plaintiff has not adduced any evidence sufficient to raise a triable issue of fact that the City's stated reason for its actions—that plaintiff had violated Department policies—was untrue or pretextual, or that the City otherwise acted with a retaliatory animus. Plaintiff's chief argument is that his conduct telling Sambar in May 2015 about Smith's earlier disability discrimination renders everything Sambar did *before* and *after* that conversation suspect. We reject this argument. As noted above, plaintiff's conversation in May—under the laws of temporal physics—could not have caused Sambar's *prior-filed* recommendation to be retaliatory. And plaintiff's conversation with Sambar in May 2015 also did not automatically taint all of Sambar's subsequent acts. Such a rule has been previously—and rightly—rejected in the past: "An employee, fearing that his job is on the line, may not raise an old wound as a preemptive strike to escape appropriate discipline or discharge." (*Arteaga, supra*, 163 Cal.App.4th at pp. 353-354.) More to the point, Sambar's subsequent act of transferring plaintiff out of Major Crimes was

19

the result of findings of misconduct by the Board of Rights based on plaintiff's own admission to violating Department policy. On the evidence presented, any inference to the contrary is "too weak" to defeat summary judgment.

*    *    *

Because our analysis is sufficient to resolve this appeal, we have no occasion to address the other arguments advanced by the parties.

<strong>DISPOSITION</strong>

The judgment is affirmed. The City is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

20