# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-1052

_____

Norah C. Oehmke

*Plaintiff - Appellant*

v.

Medtronic, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 19, 2016
Filed: December 22, 2016

_____

Before GRUENDER, BEAM, and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Norah Oehmke appeals the district court's[1] adverse grant of summary judgment in her suit against Medtronic, Inc., for disability discrimination and retaliation under

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

the Americans with Disabilities Act (ADA) and the Minnesota Human Rights Act (MHRA).  We affirm.

## I.   BACKGROUND

Because this case comes before us on Medtronic's motion for summary judgment, we portray the facts in the light most favorable to Oehmke.  Johnson v. Blaukat, 453 F.3d 1108, 1112 (8th Cir. 2006).  Oehmke was diagnosed in 1997 with Hodgkin's lymphoma, for which she received chemotherapy and radiation treatment and a bone-marrow transplant.  The cancer has been in remission since 1999.  Her treatment resulted in adverse, long-term health effects, including a suppressed immune system and cardiomyopathy.[2]  Medtronic, a medical device manufacturer, hired Oehmke as a Credit Representative in 2003.  Oehmke informed Medtronic at that time of her disability as a cancer survivor with long-term health effects.  Oehmke excelled in this position, winning awards for customer satisfaction and cost efficiency.  In 2005 Oehmke took the position of Senior Patient Services Specialist, in which she answered patient telephone calls and e-mails concerning implantable devices, warranty claims, or unreimbursed medical claims.  At the time she was hired for this position, she again communicated her disability to her hiring supervisor.

Oehmke's direct supervisor in this position was Mavis Klemmensen.  Patient Services was part of the Technical Services and Patient Services Department, managed by Lyn Stepaniak.  Klemmensen and Oehmke got along well and she consistently gave Oehmke positive performance evaluations.  She allowed Oehmke to work from home ("telework") on days when Oehmke was ill.  Because of her suppressed immune system, Oehmke became sick easily and it took her longer than

---

[2]Cardiomyopathy is "a general diagnostic term designating primary noninflammatory disease of the heart muscle." *Cardiomyopathy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

normal to recover. Medtronic's policy was to limit teleworking to two days per week, but Klemmensen allowed Oehmke to do so more often if needed. Throughout this period–roughly 2005 to 2008–Oehmke often took medical leave for medical appointments.

Oehmke applied for a higher position, Operations Lead, in April 2008. Klemmensen talked Oehmke out of applying for the position, explaining that Oehmke was already slated to be promoted to Principal Patient Services Specialist that July. During this conversation, Klemmensen stated that she perceived Oehmke as desiring power in the workplace, and made a reference to Nazis or Hitler. Although the parties dispute the context around and intent behind that reference, Oehmke understood the reference to be directed at her. Being of German heritage, she took especial exception to the statement, and this apparently initiated a deterioration in Oehmke and Klemmensen's working relationship. Klemmensen selected another, less qualified candidate for the Operations Lead position. That candidate also was a cancer survivor. Several nondisabled members of Oehmke's department were promoted in May 2008.

Medtronic management received three customer complaints referencing calls handled by Oehmke in July, August, and September of 2008. Oehmke disputes the accuracy of these complaints. Two calls involved upset patients, and although it does not appear from the record that Oehmke necessarily caused their agitated state, one of the responsibilities of a Patient Services Specialist is to use empathy to calm down upset customers. Another complaint referenced Oehmke's failure to call the patient back. In regard to one of these calls, Oehmke had written down in her call notes that the customer was "rude." This violated Medtronic's policy of using purely objective language in call notes, which are discoverable. Additionally, Klemmensen received complaints from other employees regarding Oehmke's blunt communication style. In July 2008, Klemmensen told Oehmke that she would not, in fact, be promoted to

Principal Patient Services Specialist, giving as a reason for her decision one of the patient complaints.

Oehmke met with Stepaniak and Klemmensen in September 2008 to discuss why she was not promoted. Klemmensen discussed the customer complaints and Oehmke's use of the term "rude" in her call notes. Klemmensen informed Oehmke that she would begin enforcing the two-days-a-week limit on teleworking until Oehmke demonstrated that she was consistently empathetic in dealing with patient phone calls. Oehmke requested that she continue to be able to telework as she needed, and Klemmensen later granted the request on the condition that Oehmke's calls handled from home be recorded. Oehmke agreed, although she considered this to be unfair treatment because other teleworkers were not recorded. In March 2009, Medtronic began recording all patient-services calls. Later in September 2008, another meeting occurred between Oehmke and Klemmensen at which Stepaniak was present. Stepaniak claimed that during this meeting Oehmke leaned forward toward Klemmensen in a physically intimidating manner, causing Stepaniak to be concerned that Oehmke might assault Klemmensen. Oehmke disputes this but admitted she understood that Stepaniak and Klemmensen felt physically intimidated by and fearful of her. An employee from the human-resources department was brought in at Oehmke's request for the remainder of the meeting.

Oehmke took a three-week leave of absence for illness in October 2008. Oehmke stated she had whooping cough, although this is not corroborated by medical evidence. In November 2008, Oehmke was rear ended in a car accident, causing injury to her rotator cuff and a herniated disk. In January 2009, Oehmke had a meeting with Klemmensen and an employee from human resources, Kim Durkee. During that meeting Klemmensen presented Oehmke with a spreadsheet documenting what Klemmensen said was a high absenteeism rate of 6.3% of available time to work over the previous year. Oehmke points out that this spreadsheet counted days missed for medical leave under the Family and Medical Leave Act (FMLA), which do not

count as absences under Medtronic's absenteeism policy. Stepaniak agreed in her deposition that the spreadsheet was inaccurate; Oehmke's actual absenteeism rate was 4.75%. Under Medtronic's policy, absenteeism in excess of 2% of available time to work over a twelve-month period is considered "excessive," and Stepaniak's policy regarding her department was to discuss with any employee absenteeism approaching 4%.

Because of Oehmke's injuries from her car accident and an unrelated and unspecified medical issue not related to her disability, she took a leave of absence from late February 2009 to mid-June 2009. While Oehmke was on leave, Klemmensen retired and was replaced by Patti Peltier. When Oehmke returned from leave, she made an informal request for accommodations based on her doctor's recommendation. Oehmke was told that she needed to put in a formal request. In the past, Oehmke had always been granted accommodations without going through the formal request process. After Oehmke returned from leave, Peltier changed Oehmke's old 7:00 a.m. to 4:00 p.m. schedule to 8:00 a.m. to 5:00 p.m. Oehmke claims other employees who returned from leave were allowed to keep their old schedules.

In August 2009, Oehmke received a negative performance evaluation. The evaluation contained comments from Stepaniak, who performed the review because of Klemmensen's retirement. Stepaniak, as the department manager, did not directly supervise Oehmke and so did not have the same degree of familiarity with Oehmke's work performance as Klemmensen. Oehmke disputed the accuracy of that evaluation and Durkee, in the presence of Oehmke and Stepaniak, stated that the evaluation was too hard on Oehmke. Stepaniak revised the evaluation. The revised evaluation removed some positive comments and was more negative than the first. The evaluation cited a greater than 8% absenteeism rate, but the spreadsheet on which that figure was based showed only a 6.3% rate. This was, presumably, the same inaccurate 6.3% absenteeism rate discussed above. The evaluation stated Oehmke violated the sick-leave call-in policy during her leave for whooping cough in October 2008, but

Oehmke stated she had covered her shifts by communicating via e-mail, which was consistent with past practice. Finally, the evaluation stated Oehmke had violated the telework policy, but Oehmke claims this was only due to the rescission of the past accommodation of her need to telework often. When questioned about the evaluation in a deposition, Oehmke admitted that she "sometimes" attempted to undermine leadership in her workplace.

In September 2009 Oehmke gave incorrect information to a patient's wife concerning the minimum safe distance between a fork lift and a pacemaker. The correct distance is two feet; Oehmke told the patient's wife it was six inches. Oehmke admits she gave incorrect information. While on vacation in Ireland later that month, Oehmke contracted an unidentified lung illness, for which she took medical leave from late September 2009 to early November 2009. During this absence, Oehmke exhausted her leave under the FMLA. On October 22, 2009, Stepaniak notified Oehmke that because her FMLA leave was exhausted, her position was no longer being held but that if a same or similar position was available when Oehmke was ready to return, it would be offered to her. Medtronic cites the business need to promptly fill the position due to a high volume of customer calls. On October 23 Stepaniak began conducting interviews for the position. On October 28 Oehmke notified Stepaniak that she would return on November 2. Two days later, on October 30, Stepaniak hired a replacement for Oehmke's position. This new hire took over two weeks to train and was not ready to begin her position until November 18.

Oehmke claims this delay undercuts Medtronic's business-need justification, arguing it is inconsistent for Medtronic to, in one breath, claim a need to fill a position quickly because of high call volume and, in the next, hire someone who could not be prepared to take calls until more than two weeks after Oehmke's return. Further, an administrative assistant, Kim Jinks, testified that she overheard Peltier and Stepaniak creating with relish a new position for Oehmke that they intentionally made miserable and difficult in the hope that Oehmke would quit or that they could use her inability

to fulfill the position's responsibilities as a reason to fire her. Jinks testified that Stepaniak's and Peltier's treatment of Oehmke "was unethical and was possibly harassment." Further, Stepaniak and Peltier also told Jinks directly that they wanted Oehmke gone. Oehmke argues that these facts support the inference that Stepaniak and Peltier had it in for her. In addition, Stepaniak gave deposition testimony from which it could reasonably be inferred that she doubted whether Oehmke in fact ever had cancer and that she believed Oehmke might have been lying about it. Stepaniak also told Oehmke that Oehmke was not disabled.

The new position Stepaniak and Peltier created for Oehmke was called CareLink Specialist. Oehmke accepted the new position, which she took when she returned from leave in November 2009. She received the same pay as before, was in the same department, and reported to the same supervisors. The exact responsibilities, however, were, as Oehmke puts it, a "demotion." CareLink is a system that remotely monitors patients' heart devices and transmits information about them. Oehmke was assigned the job of handling incoming and outgoing patient telephone calls about the system, as well as attending to "Logcasters," which logged errors in CareLink transmissions. Additionally, Oehmke was tasked with answering all e-mails that came in to Medtronic.com and Patient Services. She was not permitted to leave at the end of the day until all these tasks were completed. Furthermore, she was the only employee in the department to be required to stay in the queue of incoming telephone calls while working on other assignments. According to testimony from Jinks, the Logcasters responsibility was an impossibly large amount of work for a single employee. One Logcasters entry could take anywhere from five to thirty minutes to process, and Jinks–who was assigned to Logcasters at one point–reported getting roughly twenty to eighty a day. Peltier, however, testified that there were ten or less Logcasters reports a day. Soon after Oehmke took the position, she notified Peltier that she was unable to respond to certain e-mails, and she failed to keep up with her assignments.

Oehmke had submitted a letter from her physician requesting certain accommodations when she returned from her medical leave. Medtronic granted all of these except her request for a 7:00 a.m. to 4:00 p.m. schedule. Instead, she was put on a 9:00 a.m. to 6:00 p.m. schedule so that she could schedule her medical appointments in the morning before work. After receiving another letter from Oehmke's physician, Medtronic put her on a 7-to-4 schedule for one month to attend already-scheduled appointments, but then returned her to a 9-to-6 schedule afterward, with afternoons off for appointments if a morning appointment was not available. Oehmke voiced her discontent with that arrangement to both Durkee and Peltier. Oehmke claims that the 9-to-6 schedule caused her to miss more work than she would on a 7-to-4 schedule, because her appointments were often lengthy, and so morning appointments would extend beyond her 9:00 a.m. start time. Had she been able to work 7 to 4 and schedule her appointments in the late afternoon, she would have been able to complete more work. Medtronic states that it needed Oehmke to work the 9-to-6 schedule because call volumes are higher in the afternoon and because, in light of Oehmke's need for frequent absences, it is difficult to find coverage for the 7:00 a.m. shift.

On January 8, 2010, Peltier placed Oehmke on a Performance Improvement Plan ("PIP"). The PIP referenced numerous violations of Medtronic's patient-call policies dating back to August 2009–providing incorrect information; giving medical advice; making unnecessary comments to patients; failing to be empathetic–as well as failing to meet the responsibilities of the CareLink Specialist position. Oehmke refused to sign the PIP. Also in January, Stepaniak provided Oehmke with calculations showing Oehmke had a 6% absenteeism rate, and Peltier criticized Oehmke for taking medical leave too often. This 6% figure was, like the 6.3% figure described earlier, inaccurately calculated because it included days taken for FMLA leave. The figure should have been 3.7%. On January 21, 2010, Stepaniak barred Oehmke from all meetings until her work was caught up. Around this time Medtronic's legal team notified Peltier and Stepaniak that they should grant Oehmke's

request for a 7-to-4 schedule, noting that they did not understand why it was such a "big deal" to Peltier and Stepaniak.

On January 22, 2010, Oehmke met with Peltier and Durkee. Peltier testified that she wanted the meeting to take place in the presence of Durkee because of a previous incident in which Oehmke had leaned toward her with a raised voice, startling Peltier. Peltier discussed Oehmke's continuing performance issues, including her failure to stick to the scripted statements Oehmke was supposed to use for telephone calls. Peltier informed Oehmke that she would be allowed to have the 7-to-4 schedule but that she would no longer be allowed to telework. Peltier also stated that Oehmke was not permitted to discuss her workload with other employees, as she had heard complaints from other employees that Oehmke had been interrupting them during the day to complain about her workload. Peltier testified that Oehmke was taunting toward Peltier and laughed at everything she said. Durkee, who was present, stated that Oehmke asked a lot of questions and never stated agreement with or understanding of Peltier's statements. Durkee testified that Oehmke did laugh and that it was a laugh that could be perceived as "sarcastic" and "belligerent." Stepaniak testified that Peltier told her that Oehmke had said she was "totally protected" because she was disabled. Oehmke disputes Peltier's and Durkee's accounts of her conduct at the meeting. Later that day, Peltier and Stepaniak approached Oehmke with a security guard and told her she was suspended. Oehmke was escorted off of the premises by the security guard. Durkee stated she was surprised to learn that Peltier and Stepaniak had suspended Oehmke, and that they did so directly without going through human resources.

Oehmke and her attorney met with Medtronic's in-house counsel, Anthony Branch, on February 24, 2010. At this meeting Oehmke explained her desire to be employed in a different department of Medtronic so she could avoid the toxic relationship that had developed between her and Stepaniak and Peltier. Oehmke left the meeting with the understanding that Branch was going to set up an informational

interview between her and a Medtronic employee about a Clinical Specialist position. Oehmke testified that at no point during the meeting did the parties discuss her leaving Medtronic. On March 2, 2010, Oehmke received a letter from Branch with a proposed separation agreement and release. On March 22, Oehmke wrote an e-mail to Branch in which she stated that she could not agree to the settlement terms. Oehmke received a letter from Durkee stating: "Since you have rejected Medtronic's settlement offer, Medtronic will terminate your employment effective today March 26, 2010."

Oehmke filed this action, bringing claims under the ADA and MHRA against Medtronic, claiming as a disability her status as a cancer survivor. The district court granted Medtronic's motion for summary judgment. It found Oehmke's claims time barred with respect to all of Medtronic's alleged discriminatory acts except for Oehmke's termination on March 26. As to Oehmke's discrimination claim, it concluded that Oehmke had not made out a prima facie case of discrimination because she had not raised a dispute as to causation between her disability and her termination. In the alternative, it concluded that even if she had shown causation, she had failed to raise a dispute as to pretext. As to Oehmke's retaliation claim, the district court concluded Oehmke had again failed to raise a dispute as to causation between her protected activity and her termination.

## II.    DISCUSSION

We review the district court's grant of summary judgment de novo, reading the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor. Montgomery v. City of Ames, 749 F.3d 689, 694 (8th Cir. 2014). A movant is entitled to summary judgment if the record, so construed, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

-10-

## A.     Discrimination Claim

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees."    42 U.S.C. § 12112(a).    In the absence of direct evidence of discrimination, we apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to disability-discrimination claims of disparate treatment.[3] Wenzel v. Mo.–Am. Water Co., 404 F.3d 1038, 1040 (8th Cir. 2005). The plaintiff first has the burden of establishing a prima facie case:  (1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job; and (3) a causal connection between an adverse employment action and the disability.  Id.  The burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action.  Id.  Finally, the burden shifts back to the employee to show that the proffered reason was, in reality, a pretext for discrimination.  Id.  We employ this same analysis,

---

[3]Direct evidence is evidence that establishes a specific link between alleged discriminatory animus and an adverse action of such causal strength that the plaintiff can forgo the burden-shifting framework.  St. Martin v. City of St. Paul, 680 F.3d 1027, 1033 (8th Cir. 2012).  The district court concluded there was no direct evidence, and we agree.  Oehmke points to evidence showing Stepaniak, despite medical documentation provided Medtronic, did not believe Oehmke had had cancer and that she suspected Oehmke may have been lying about it.  But this shows Stepaniak might have targeted Oehmke because she believed Oehmke was untruthful, not because of her disability.  Such a statement fails to prove a sufficiently strong causal connection as to rise to the level of direct evidence.  Because Oehmke did not present direct evidence of discrimination, we do not reach Medtronic's argument that in the context of the ADA a plaintiff may not use direct evidence to forgo the McDonnell Douglas burden-shifting framework.

with one difference of no consequence here,[4] to discrimination claims under the MHRA. Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004).

Oehmke's theory of disability discrimination is that her bout with cancer left lingering, long-term effects–a suppressed immune system, cardiomyopathy, and other unspecified side effects from her treatment–which caused frequent absences from work for medical appointments, and which left her in need of certain accommodations such as teleworking and a schedule that allowed her to attend her appointments without missing work. Oehmke claims Medtronic terminated her because it did not want to accommodate her scheduling needs, thereby discriminating against her on the basis of her disability.[5] The district court decided Oehmke failed to prove both the causation element of a prima facie discrimination claim and, in the alternative, that Medtronic's proffered reason for termination was pretextual. The parties dispute these two issues as well as the nature of Oehmke's disability.

## 1.    Oehmke's Disability

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). Cancer is an impairment, 29 C.F.R. § 1630.2(h)(1), the functioning of one's immune system is a major life activity, 42 U.S.C. § 12102(2)(B), and Congress has instructed the courts to determine whether a limitation is substantial in

_____

[4]The MHRA applies a less stringent "materially limits" standard in determining whether a plaintiff is disabled. Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004).

[5]Because the only action of Medtronic's that was within the limitations period is its termination of Oehmke's employment, Oehmke's claim does not cover any alleged failure of Medtronic to accommodate her needs. We therefore understand her claim as one based on a theory of disparate treatment, rather than a failure to accommodate.

-12-

light of its command to interpret disability broadly, 42 U.S.C. § 12102(4)(B); ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Further, "an impairment that is . . . in remission," as is Oehmke's cancer, "is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Therefore, Oehmke's cancer, even while in remission, is clearly a covered disability under the ADA.

In her briefing, Oehmke argues her disability as a cancer survivor includes its lingering effects on her health and her suppressed immune system. She argues that the district court took an inappropriately narrow view of her disability, treating it as a past event when in fact it was a continuing condition with extended effects. Essentially, Oehmke appears to argue that *both* her cancer *and* the substantial limitations it has placed on her health are "disabilities" under the ADA. Medtronic responds that Oehmke did not make this argument below and that she only alleged her bout with cancer itself as a disability. Ultimately, however, it does not matter how we characterize the effects of Oehmke's bout with cancer. There is evidence in the record supporting a causal connection between the cancer and certain of her long-term health problems, and so in either event the causation element of Oehmke's prima facie claim rises or falls on the existence of a causal connection between the challenged employment action and those long-term health problems.

###    2.    Causation

We apply a mixed-motive causation standard, allowing claims based on an adverse employment action that was motivated by both permissible and impermissible factors. See Pedigo v. P.A.M. Transport, Inc., 60 F.3d 1300, 1301 (8th Cir. 1995).[6]

---

[6]Medtronic argues that under the Supreme Court's holding in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), ADA discrimination claims require a but-for causation standard. Gross's reasoning, which it applied to the "because of" language in the Age Discrimination in Employment Act, arguably could be extended

-13-

The issue, then, is whether the record supports the conclusion that absences caused by Oehmke's cancer-related health problems and her need for accommodations motivated Medtronic's decision to terminate her. The record discloses that the decision to terminate Oehmke was made because of her rejection of Medtronic's settlement offer, which in turn was caused by her suspension for failing to meet the requirements of her CareLink Specialist position and her PIP. Giving Oehmke the benefit of all reasonable inferences, we assume that the CareLink Specialist position carried impossibly difficult responsibilities, and that Stepaniak and Peltier assigned Oehmke to that position in the hopes of having cause to suspend or terminate her. We will not consider, therefore, Oehmke's inability to keep up with her duties in that position as the true cause of her termination.

It is clear that Stepaniak and Peltier had myriad concerns with Oehmke's performance that provide a permissible motive for her termination. She gave incorrect and potentially life-threatening advice concerning a patient's pacemaker; she was perceived by her managers as insolent, threatening, and she admitted to attempting to undermine their authority; she failed to follow Medtronic's procedures such as using objective language in call notes and sticking to call scripts; and she was repeatedly

---

to the comparable "on the basis of" language in the ADA. See Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1002 (8th Cir. 2012) ("We have our doubts about the vitality of the pre-Gross [ADA] precedent."); see also Gentry v. E.W. Partners Club Mgmt. Co., 816 F.3d 228, 233-36 (4th Cir. 2016) (holding, in reliance on Gross, ADA discrimination claims require a showing of but-for causation); Lewis v. Huboldt Acquisition Corp., 681 F.3d 312, 317-22 (6th Cir. 2012) (en banc) (same for earlier, differently worded version of ADA); Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 958-63 (7th Cir. 2010) (same for earlier version). Because the potential effect of Gross on our interpretation of the ADA has been only cursorily briefed by Medtronic and because we agree with the district court that Medtronic is entitled to summary judgment even under the less restrictive mixed-motive causation standard, we decline to address this important question at this time.

present in interactions with customers that gave rise to complaints. These problems certainly provided a permissible basis for concern from Medtronic.

Oehmke argues that evidence in the record supports the inference that Medtronic had impermissible motives. She points to two indications that Stepaniak and Peltier were motivated by Oehmke's frequent need to be absent for medical appointments and for scheduling and other accommodations. First, there does appear in the record evidence that Oehmke's absenteeism, in part, motivated Stepaniak and Peltier's negative view of Oehmke's performance. Stepaniak and Peltier brought up Oehmke's absenteeism to her on at least two occasions, and on three occasions, Stepaniak overestimated Oehmke's absenteeism rate. What is less clear is the causal connection between Oehmke's absences and her disability. Oehmke makes a generalized claim that she needed to make frequent medical appointments because of health problems caused by her struggle with cancer, testifying that she was ill a minimum of four times a year and that she saw her physician every four weeks due to a risk of stroke or heart attack related to her fight with cancer. But this claim is not supported by particularized medical evidence of any specific appointments and the health issues for which they were necessary. Were we to extend the reach of reasonable inference to the questionable conclusion that *any* illness-related absence of Oehmke's was necessarily caused by her suppressed immune system, this conclusion would only reach her absences for whooping cough and an unidentified lung illness. Oehmke presents no medical evidence diagnosing her with either of these alleged afflictions, and no evidence connects her absences for other identified medical issues to her disability.

Second, Oehmke argues that Stepaniak's belief that Oehmke might not have had cancer and was lying about it could give rise to an inference that Stepaniak did not think Oehmke's accommodations were necessary, that she did not want to provide those accommodations, and that this in turn caused her to take a negative view of Oehmke's performance. This inference is supported by Stepaniak's reluctance to

provide Oehmke with an exception to Medtronic's teleworking policy and to accommodate her requested 7-to-4 schedule. But other evidence undercuts this inference. Medtronic granted nearly every accommodation request made by Oehmke and its insistence on a 9-to-6 schedule had a legitimate, business-need justification. Further, the 9-to-6 schedule accommodated Oehmke's need to attend medical appointments, just not precisely in the manner Oehmke would have preferred. We also note that Stepaniak's statement questioning whether Oehmke had suffered from cancer were made in a deposition years after the events in question, minimizing its relevance.

In this context, we agree with the district court that there does not exist a strong enough causal connection sufficient as a matter of law to establish a prima facie case. Therefore we affirm the grant of summary judgment for Medtronic on Oehmke's disability discrimination claims under the ADA and MHRA, and we find it unnecessary to address the alternate ground for affirmance of pretext.

## B.    Retaliation Claim

Oehmke also claims that Medtronic terminated her in retaliation for asserting her rights under the ADA and MHRA at her meeting with Branch and for her rejection of Medtronic's settlement offer. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). A retaliation claim follows the same direct evidence or burden-shifting analysis employed in discrimination claims. EEOC v. Prod. Fabricators, Inc., 763 F.3d 963, 972 (8th Cir. 2014). A prima facie case of retaliation requires the plaintiff to show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. Hill v. Walker, 737 F.3d 1209, 1218 (8th Cir. 2013). A retaliation claim under the ADA requires a but-for causal connection between the employee's assertion of her ADA rights and an adverse action by the

employer. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013). The district court determined Oehmke could not show causation. As we have already stated, Medtronic had cause to terminate Oehmke due to her performance issues. Oehmke presented no evidence that any purported statements she made to Branch at their meeting motivated Medtronic's decision to terminate her, and her rejection of Medtronic's proposed settlement agreement is not an activity protected under the ADA.

Claims for retaliation are analyzed in the same manner under the MHRA. Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983). Although the Minnesota Supreme Court has looked to claims under Title I of the ADA in interpreting the MHRA, Kolton v. County of Anoka, 645 N.W.2d 403, 408 (Minn. 2002), no Minnesota case we are aware of has addressed whether Nasser's application of the but-for causation standard to ADA claims applies to MHRA claims as well. But there is no evidence of a retaliatory motive on Medtronic's part to support a showing of causation even under a mixed-motive standard. We therefore affirm judgment for Medtronic on this claim as well.

## III.   CONCLUSION

For the foregoing reasons, we affirm.[7]

_____

_____

[7]Because we affirm, we do not reach Medtronic's alternate argument that all of Oehmke's claims are time barred.