# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2731
_____

Quindon M. Yelder

*Plaintiff - Appellant*

v.

Pete Hegseth, Secretary of Defense

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: May 14, 2025
Filed: August 15, 2025
_____

Before COLLOTON, Chief Judge, SMITH and SHEPHERD, Circuit Judges.
_____

SMITH, Circuit Judge.

Quindon M. Yelder, a former employee of the Defense Commissary Agency (DeCA) at Offutt Air Force Commissary (Offutt), filed suit against the Secretary of Defense (government) alleging that he was denied accommodations for his disabilities and was harassed in violation of the Rehabilitation Act of 1973. He additionally alleged that he was discriminated against based on his race and gender

and was subjected to harassment and a hostile work environment in violation of Title VII of the Civil Rights Act. The government moved for summary judgment, which the district court[1] granted. Yelder appeals the district court's adverse grant of summary judgment on all claims. For the following reasons, we affirm.

I. *Background*

The DeCA is an agency within the Department of Defense (DoD). Offutt is one of the commissaries that the DeCA operates, which provide military personnel retirees and their families with tax-free shopping. Offutt employs approximately 42 to 50 federal workers and an additional 45 contractors. From October 17, 2016, to August 1, 2019, Yelder was a Store Worker in Offutt's Produce Department.[2] At the outset of Yelder's employment, Joe Messina was the Produce Department Manager and Yelder's first-level supervisor. After Messina's retirement in December 2017, Rikki Parker became the Produce Department Manager and Yelder's first-level supervisor in January 2018.

Several months into Yelder's employment, in February 2017, Yelder's father, Tim Yelder (Tim), requested a meeting with management "to communicate Quindon Yelder's [c]oncerns." R. Doc. 91-2, at 5 (internal quotation marks omitted). Tim advised management that Yelder "need[ed] support from his team to be more productive and succeed in [the] store." *Id.* (internal quotation marks omitted). On February 25, 2017, Messina; Yelder; Tim; and Store Manager Dawnell Pafundi,

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

[2]The Produce Department operates with three shifts: opening, mid, and closing. Employees working the morning shift must place perishable items on the sales floor, ensure that shelves and displays are fully stocked, and receive items. Employees working the mid-shift must clean, assist customers, stock, and cull items from shelves and displays. Employees working the closing shift must clean, stock, take out the trash, warehouse, and place perishable items back into coolers.

Yelder's second level manager, met to discuss Yelder's work. According to Tim, he wanted Yelder "to feel comfortable in his environment" and wanted to "eliminate" Yelder feeling "any type of intimidation." R. Doc. 101-9, at 25. Yelder "felt he was being retaliated against and abusive conduct and language [were used] towards him." *Id.* During the meeting, Tim raised several topics for discussion, including quarterly performance reviews, access to email and training, and scheduling and leave.

Also during the meeting, Tim stated that "Yelder had a disability." R. Doc. 91-2, at 6. But Tim never identified or explained "the nature of . . . Yelder's disability." *Id.*; *see also* R. Doc. 91-7, at 18 ("I didn't give them his specific medical disability."). Yelder himself also never stated or acknowledged that he had a disability. "When Tim . . . said that [Yelder] had a disability, he looked at [Yelder] and [Yelder] shook his head no." R. Doc. 91-2, at 6. Yelder never provided Pafundi with "any paperwork or medical or school reports that alleged that . . . Yelder had a disability." *Id.*[3]

Tim requested, on Yelder's behalf, that Yelder be afforded "more time to . . . complete tasks" because management had said that Yelder "was moving too slow." R. Doc. 101-9, at 26. Tim and Yelder "asked that [Yelder] have open communication with his supervisor to be able to relay his thoughts and ideas and, . . . reasons for whatever shortcomings that came up." *Id.* Another "accommodation" that Tim and Yelder requested "was making sure [that Yelder] g[o]t trained properly" because he lacked computer-based "training at that time." *Id.* They also requested that Yelder "be able to take breaks when he needed to." *Id.* at 28. At the meeting's conclusion, Yelder, Tim, Pafundi, and Messina agreed that Yelder would receive additional training; could ask questions of his training sponsor; would be afforded a few extra

---

[3]During Yelder's employment, Pafundi observed that Yelder was "a little slower than others." R. Doc. 101-1, at 3. Pafundi did not know the reason for this. R. Doc. 91-2, at 6. Pafundi did not connect this to a disability. R. Doc. 101-1, at 10–11.

minutes to complete tasks; and would have his school schedule accommodated for the semester, to the extent possible.

On April 29, 2017, Messina held an "Employee Performance and Results meeting" with Yelder. R. Doc. 101-6, at 1. During the meeting, Messina advised Yelder that his work was unsatisfactory. Following the meeting, Yelder sent a memorandum to Messina in which he claimed that he had "not received all the support [that he had] requested" during the February 2017 meeting. *Id.* Yelder listed the following "[w]orkplace items" that he had not yet "received support with[,] includ[ing] obtaining computer access, email account, leave website, worklist, new employee orientation, sponsor, web base training, training resources, Occupational Training Plan (skills to perform duties), and Individual Development Plan." *Id.* He also asserted that he had "requested reasonable accommodations for speed limits and learning new tasks." *Id.* He maintained that, during the February 2017 meeting, "everyone agreed upon solutions which would help [Yelder] improve as an employee." *Id.*

The following year, shortly after Parker became the Produce Department Manager in January 2018, she noticed that "Yelder did not complete tasks in the same timeframe that other employees d[id]" and "that he had to be retrained many times on the same tasks." R. Doc. 91-3, at 8. Parker, along with other employees, retrained Yelder.

In February 2018, Parker "mandated that all employees be trained to work all shifts" "to make the store more efficient." *Id.* at 3. That meant that "employees normally assigned to do opening shift had to train on closing procedures and vice versa." *Id.* "In August 2018, after everyone was trained on all shifts and job duties, [Parker] assigned shifts based on the employee's strengths." *Id.* Parker notified employees "of their work schedules and shift duties (receiving, inventory, culling or warehousing) at least two weeks in advance of the workweek." *Id.* at 5. Parker

-4-

assigned warehousing "to the closing shift so that all produce was placed in the proper storage location before the store was closed for the day." *Id.* at 4. Warehousing duties included "lift[ing] heavy boxes of produce [and] unpack[ing] and organiz[ing] them, oftentimes in the cooler which is very cold." *Id.*

According to Yelder, he, along with the other male employees, complained about warehousing duties. Yelder believed that Parker "started scheduling people [to] do warehousing because . . . . nobody liked doing the warehousing." R. Doc. 101-2, at 30–31. Yelder believed that Parker scheduled him the most for warehousing "because she didn't like [him]" and did it "for . . . punishment." *Id.* at 31. He thought that Parker might not like him because of his "race or personality." *Id.* Parker would write Yelder up for not completing his warehousing duties. Yelder believed that Parker did not schedule female employees for warehousing. *See id.* at 35 (stating that the female employees "wouldn't do warehousing at all"). He also believed that female employees got weekends off more often than he did. *See id.* at 38 (stating that Myra Lammert "didn't do warehousing, and she got weekends off all the time"). Shift schedule records, however, confirm that all job duties were performed on a rotating basis, including by the female employees. *See* R. Doc. 91-3, at 14–50.[4]

---

[4]*See also id.* at 4 ("Warehousing duties were assigned [by Parker] to all employees (male and female) on a rotating basis."); R. Doc. 91-4, at 4 ("I [Steven Kelsey] have personally witnessed female employees do warehousing."); R. Doc. 91-5, at 4 ("I [Rebecca Miteff] personally witnessed Myra [Lammert] do warehousing. Warehousing was assigned on a rotational basis."); R. Doc. 91-6, at 4 ("I [Shawn Benson] have personally witnessed female employees do warehousing."). In the fall of 2018, Parker had ten male employees and two female employees in the Produce Department. According to Parker, "[n]one of the employees . . . like warehousing." R. Doc. 91-3, at 4. Parker also required "all employees . . . to work at least one day on the weekend (Saturday or Sunday)." *Id.* at 2; *see also* R. Doc. 91-4, at 3 ("I [Steven Kelsey] have personally witnessed female employees work on weekends."); Doc. 91-5, at 3 ("When [Parker] was my supervisor, I [Rebecca Miteff] had Sundays off, but I worked on Saturdays."); R. Doc. 91-6, at 3 ("I [Shawn Benson] have personally witnessed female employees work on weekends.").

Yelder contends that Assistant Commissary Officer Judy Ring, Pafundi's direct supervisor, as well as Messina or Parker, would "harass" Yelder about needing a doctor's note each time he called in to take a sick day. R. Doc. 91-7, at 32. Yelder asserts this was harassment because sick leave policy only required employees to provide a doctor's note if they were sick longer than three days.

According to Yelder, Parker denied and overly scrutinized his annual leave requests by not "allow[ing] [him] to take [his] vacation leave." R. Doc. 101-2, at 39. Yelder recalled Parker letting Lammert take annual leave instead of him despite Yelder having seniority.[5] Yelder also remembered Parker ripping up his leave request form for vacation leave in 2019. Parker told Yelder that "it was the wrong one." R. Doc. 101-2, at 41. Yelder agreed that "[i]t was the wrong form" but felt that Parker's tone was "mean." *Id.*

Parker held weekly meetings with Produce Department staff to discuss problems and procedural changes. During these weekly meetings, Parker admits telling the "staff that Walmart is down the street, and they are all free to go work for them. [She] . . . also told staff to 'pick up the pace' when it comes to getting tasks done in a timely manner." R. Doc. 91-3, at 9. Parker's comments were made to the entire staff, not just Yelder.[6] During the meetings, Parker also had the staff put tissue

_____

[5]To take annual leave, employees were required to "submit annual leave planners to their supervisor by February 1 of each year to identify their desired annual leave." R. Doc. 91-3, at 6. "If multiple employees request[ed] the same annual leave, final approval [was] based on seniority." *Id.* Leave requested after February 1 was "granted on a first come, first serve basis, again keeping in mind staffing requirements and employee workload." *Id.*

[6]*See id.* ("These comments were made in the presence of and directed at all produce department staff, not just Mr. Yelder."); R. Doc. 91-4, at 4 ("During [weekly staff] meetings[,] [Parker] would say things like 'pick up the pace.' Her comments were directed at all staff."); R. Doc. 91-5, at 4 ("During [weekly staff] meetings[,]

-6-

in their ears to show that they were not listening. The staff "listened" and put the tissue in their ears. R. Doc. 101-2, at 15. Yelder also recalled Parker having him put tissue in his ears during reviews. Additionally, Parker called Yelder "too slow" and "lazy" during his reviews. *Id.* at 47.

"In early 2019, [Parker became] suspicious that Mr. Yelder had a mental disability" and sought counsel from Osbert Okebata, DeCA Human Resources Specialist. R. Doc. 91-3, at 8. "Okebata advised [Parker] that there was nothing in Mr. Yelder's personnel file to indicate that he had a mental disability. As such, [Parker] continued to treat Mr. Yelder as if he did not have a mental disability." *Id.* At no time did Yelder advise Parker "that he suffered from any mental disability or medical condition, nor did he request an accommodation" from Parker. *Id.*

On August 1, 2019, matters came to a head. Yelder was scheduled to do warehousing from 10:00 a.m. to 4:30 p.m. At 12:45 p.m., Parker made her usual rounds. When Parker entered the warehousing area, Yelder asked Parker if he could go to lunch. Parker inquired of Yelder whether he had completed his warehousing duties. Yelder replied that he had two pallets left. Parker advised Yelder to complete the two pallets and then take his lunch. Parker returned to her office. After a few minutes, Yelder came to Parker's office door and said that he did not understand why he could not take his lunch. Parker reiterated that Yelder could take his lunch after completing the two pallets. When Yelder expressed disagreement, Parker requested that Yelder come into her office to have a private conversation. "Yelder responded, '[G]ood because you are not going to like it.'" *Id.* at 11. Yelder entered the office, sat down, and again asked why he could not take his lunch break. Once again, Parker informed Yelder that he would need to complete the two pallets. Yelder insisted "that

_____

[Parker] would say things like 'speed it up.' . . . Her comments were directed at all staff to make sure we stayed on task to get everything done."); R. Doc. 91-6, at 4 ("When we had meetings around holidays or after [Parker] received complaints from other managers . . . , [Parker] would tell us to 'pick up the pace.'").

it was his time to go to lunch." *Id.* Parker directed Yelder to finish processing the two pallets. Yelder refused. Parker informed Yelder that he had been at work for less than three hours. Yelder "accused [Parker] of playing favorites," stating that "some of his peers were allowed to take breaks wherever they want." *Id.* Parker responded "that his peers generally worked at a quicker pace and as such [she] did not have to ask them if they completed tasks before they were allowed to go on break." *Id.* at 11–12.

"Yelder then complained that a female peer left salads that needed to be warehoused." *Id.* at 12. Parker responded "that the peer was working by herself and got behind and that sometimes the next shift must be flexible." *Id.* Parker additionally "reminded him of the times when he was on closing shift and did not complete his job duties, which made more work for the morning shift." *Id.* Parker instructed Yelder that if he failed to complete the two pallets before taking his lunch break, "he would receive a letter of counseling for insubordination." *Id.* Yelder responded that he did not care. When Parker suggested that they go speak with Pafundi, Ring, or Store Director Anthony Chaki, Yelder declined. Yelder told Parker that he quit and exited the office.

Pafundi saw Yelder leaving the building and approached him. Pafundi requested that Yelder come back into the store so they could talk. According to Pafundi, Yelder "cussed [her] out." R. Doc. 91-7, at 8. Pafundi retrieved Yelder's boots and key card.[7]

Yelder submitted a "Memorandum for HR" dated August 1, 2019, regarding his resignation. R. Doc. 101-3, at 2 (all caps and bold omitted). In the memo, Yelder alleged that Parker "unfairly tried to characterize [him] as someone who intentionally

---

[7]Pafundi claims that Yelder "threw his boots in the middle of the street" and "threw his [key] card in the middle of the road" when she asked for them. *Id.* In his brief, Yelder denies doing so. *See* Appellant's Br. at 8.

does not follow instructions," noting that he had "received three letters of counseling within six months." *Id.* Yelder stated his belief that Parker treated him unfairly because she intended to fire him. Yelder described experiencing stress in his work environment because Parker pressured him and favored other employees in scheduling.

Yelder also outlined some of Parker's conduct in the memorandum (much of which is described above). Yelder drafted the memorandum hoping that "someone [would] look into [his] complaint to prevent others from being subjected to this type of treatment and environment." *Id.* at 6. Notably, Yelder's memorandum did not allege that he asked for or failed to receive a disability accommodation.[8]

On August 6, 2019, Yelder contacted an Equal Employment Opportunity counselor. Yelder told the counselor that he was denied a reasonable accommodation for his disability. Kevin Hennelly, DeCA Disability Program Manger, advised Offutt management to engage in the reasonable accommodation interactive process to determine whether Yelder could be reinstated. Pafundi and Chaki agreed to participate in the interactive process.

On August 28, 2019, Yelder submitted a Confirmation of Request for Reasonable Accommodation form. Parker responded by sending Yelder a Reasonable Accommodation memorandum with an ADA-Related Questionnaire (questionnaire) attached. It contained eight sections for completion. In late September 2019, Hennelly received the completed questionnaire signed by Dr. Matthew Garlinghouse, a neuropsychologist. In relevant part, section 1 of the completed questionnaire listed Yelder's medical diagnoses as "[e]pilepsy, [c]omplex [p]artial, [s]eizures, and

---

[8]Yelder's only reference to "accommodation" in the memorandum was his statement that upper management had told him in the past that he "would not be able to attend college because set scheduling or other accommodations were not allowed" despite Yelder "see[ing] accommodations made for others." *Id.* at 6.

[p]ains;" additionally, it stated that Yelder "has education records qualifying him as an individual with disabilities in [h]ealth impairment, [l]earning disability and [s]peech-[l]anguage impairment." R. Doc. 91-1, at 10. Section 4 explained how Yelder's impairments limit him:

> [Yelder] reported he has been working the job for thirty-three months without limitations. However, his medical diagnoses, educational support history and communication skills shows how his major life activities are affected. Speaking: [Yelder] requires support due to [s]peech impairment in generalizing his articulation skills to spontaneous conversation. Learning: [Yelder] requires support with a learning disability. He is a visual and hands on learner that requires simple and clear directions with repetitions to fully comprehend. Concentrating: [Yelder] is easily upset, distracted and loss [sic] focus. A supportive, non-threatening, low stress and professional work environment would help him concentrate, manage pains and anxieties. Communicating: [Yelder] needs support with communication due to [s]peech [l]anguage impairment; particularly receptive language. Although, I do not see any tasks to limit, I do recommend some accommodations to help him manage his health.

*Id.* at 11. Section 6 described how Yelder's medical impairments limit his ability to perform his duties:

> [Yelder] has reported performing the duties for almost three years, so I do not see an issue there. However, there is a caution that should be taken with a patient that have [sic] a history of seizures and that is the patient could have a seizure, fall and injure their head which could cause brain damage. Therefore, I recommend the following reasonable accommodations to help [Yelder] manage his health: taking allowed breaks and leave, allow enough time to complete tasks at his pace, provide worklists, shift rotation, open communication w/supervisor, repetition and hands on visual instructions, no public shaming, allow mistakes as training opportunities, allow sick call.

*Id.* at 12. Section 7 stated, "I do not recommend reassignment," and Section 8 answered "[n]o" to whether Yelder should "consider reducing the number of hours he . . . is scheduled to work" and whether he should "invoke his entitlement to time off under the Family and Medical Leave Act." *Id.*

After reviewing the completed questionnaire, Hennelly "was unable to find any information to suggest that Mr. Yelder's medical diagnoses of epilepsy, seizures and pain would cause him to act in the manner Ms. Pafundi described." *Id.* at 3. Ultimately, the interactive process ended with no resolution. Subsequently, the EEOC sent Yelder a Notice of Appeal rights indicating that Yelder did not prove that the government "subjected him to unlawful disparate treatment and harassment based on his sex, race, and disability as presented in his formal complaint or that management failed to accommodate him as agreed upon in February 2017." R. Doc. 114, at 2–3 (citing R. Doc. 1-1, at 7).

Yelder then filed suit in district court, alleging that the government violated Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973 by discriminating against him based on his disability, race, and gender. He further alleged that the government failed to accommodate his disability and created a hostile working environment leading to his constructive discharge on August 1, 2019. During discovery, Dr. Garlinghouse was deposed. Dr. Garlinghouse testified that Yelder "refused an evaluation." R. Doc. 91-7, at 61. But he recalled that Yelder and Tim "request[ed] that [he] write a letter." *Id.* Dr. Garlinghouse had no "recollection of doing any record review for this case because [Yelder] did not want an evaluation." *Id.* at 63. Dr. Garlinghouse had "no recollection" of completing section 4 of the questionnaire concerning how Yelder's impairments limit him. *Id.* at 62. Dr. Garlinghouse did not "see how [he] could have written [it] . . . because [he] didn't evaluate [Yelder]." *Id.* Dr. Garlinghouse denied knowing whether Yelder "has a disability in health impairment," "a learning disability," or a "speech language

impairment." *Id.* at 64. During Tim's deposition, he admitted that he—not Dr. Garlinghouse—completed section 1, 4, 6, 7, and 8 of the questionnaire.

The government moved for summary judgment on all claims, which the district court granted. First, the district court determined that Yelder's disability discrimination and reasonable accommodation claims failed because "Yelder provided no relevant evidence" of his disability. R. Doc. 114, at 13. Specifically, "Yelder failed to specifically identify his alleged disability and resulting limitations" during the February 2017 meeting, and the completed questionnaire signed by Dr. Garlinghouse was "not evidence" of a disability given Dr. Garlinghouse's agreement that "[i]t lacks credibility." *Id.* Second, the district court determined that Yelder's hostile work environment claim failed because Yelder failed to prove that any "connection [existed] between any alleged harassment and Yelder's race or gender." *Id.* at 15. Furthermore, the court found "no evidence of severe or pervasive conduct." *Id.*

## II. *Discussion*

On appeal, Yelder argues that the district court erred in granting summary judgment on his disability discrimination, reasonable accommodation, and hostile work environment claims.

We review a district court's grant of summary judgment de novo. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A district court properly grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson*, 643 F.3d at 1042 (internal quotation marks omitted).

A. *Disability Discrimination*

"The Rehabilitation Act . . . forbids discrimination against an 'otherwise qualified individual with a disability . . . , solely by reason of her or his disability.'" *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (second ellipsis in original) (quoting 29 U.S.C. § 794). "In the absence of direct evidence of discrimination,[9] we apply the [*McDonnell Douglas*[10]] burden-shifting framework . . . to disability-discrimination claims of disparate treatment." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016) (applying the Americans with Disabilities Act (ADA)).[11] Under this burden-shifting analysis, the employee must establish a prima face case of disability discrimination; if successful, "[t]he burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action." *Oehmke*, 844 F.3d at 755. After the employer sets forth its reason for the adverse action, "the burden shifts back to the employee to show that the proffered reason was, in reality, a pretext for discrimination." *Id.*

To establish a prima face case of disability discrimination, the employee must show the following: (1) he was disabled, (2) he "was qualified to perform the essential functions of the job"; and (3) there is "a causal connection between an adverse employment action and the disability." *Id.* Here, the parties agree that the second element of the prima face case is satisfied. *See* R. Doc. 114, at 8 ("[The

---

[9]It is undisputed that Yelder proffered no direct evidence of discrimination.

[10]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[11]Like the Rehabilitation Act, the ADA also "prohibit[s] employers from discriminating against a disabled individual qualified for a job because of the disability of such individual. Our cases interpreting these acts are interchangeable." *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008) (citations omitted). As a result, cases analyzing the ADA apply the same analysis as those analyzing the Rehabilitation Act. *Id.*

government] agrees that Yelder can do the job functions with or without reasonable accommodations.").

"The first element requires the plaintiff to show that [he] was a disabled person, or a person regarded as disabled, within the meaning of the [Rehabilitation Act]." *Canning v. Creighton Univ.*, 995 F.3d 603, 614 (8th Cir. 2021). The Rehabilitation Act uses the same definition as the ADA for an individual with a disability. *See* 29 U.S.C. § 705(20)(B). "[D]isability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C). Working is recognized as a major life activity. *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006).

Yelder challenges the district court's conclusion that he failed to prove he was "disabled." Yelder argues that he has a "disability" within the meaning of § 12102(1)(A) because he "suffers from several conditions that limit one or more of his major life activities, including work." Appellant's Br. at 14.[12] According to Yelder, these conditions "limit [his] ability to learn, speak, communicate, concentrate, and . . . may [cause him to] suffer from seizures due to stress." Appellant's Br. at 14. Yelder maintains that, as his father Tim testified, he "marked the box on his [employment] application indicating that he had disabilities." *Id.* He also cites Tim's request for the February 2017 meeting "specifically to discuss Yelder's needs and

---

[12]Yelder has not argued that his employer "regarded [him] as having . . . an impairment." *See* 42 U.S.C. § 12102(1)(C); *see also Canning*, 995 F.3d at 615 ("[A] person is regarded as disabled if [his] employer mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities or mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities."). As a result, we will only address whether Yelder produced sufficient evidence that he has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).

-14-

accommodation requests." *Id.* He asserts that during the February 2017 meeting, he and his father "notified [d]efendant's management of the relevant details and explained how Yelder's disabilities limited his life activities." *Id.* Yelder maintains that Pafundi "was aware of the nature of Yelder's disabilities, likening them to her son's." *Id.* at 15. He asserts that he was not required "to disclose the exact name or nature of his disability, just how it limits a major life activity." *Id.* According to Yelder, he "disclosed sufficient details of his disability to put [d]efendant on notice of it and his need for accommodations." *Id.*

The government responds that the record contains insufficient evidence that Yelder has a disability. First, the government argues that "the record contains no applications to corroborate" Tim's testimony "that Yelder self-disclosed a disability on his application." Appellee's Br. at 25 (citing R. Doc. 101-9, at 20). We agree. Tim testified, "If you look at [Yelder's] application, he had self-identified with needing [sic] a disability. He didn't put the reason because . . . he thought he can do this on his own . . . ." R. Doc. 101-9, at 20. But there are no applications in the record to substantiate this testimony.

The government also points out that neither Yelder nor his father "conveyed during the February 2017 meeting" "[t]he nature of Yelder's disability." Appellee's Br. at 31. The government is correct. Yelder failed to identify the "physical or mental impairment[s]" he suffers from "that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A); *cf. Kowitz v. Trinity Health*, 839 F.3d 742, 748 (8th Cir. 2016) ("An employee is required . . . to provide the employer with enough information that, under the circumstances, the employer can be fairly said to know of . . . the disability . . . ." (cleaned up)). During the meeting, Tim stated that "Yelder had a disability." R. Doc. 91-2, at 6. But Tim never explained "the nature of . . . Yelder's disability." *Id.*; *see also* R. Doc. 91-7, at 18 ("I didn't give them his specific medical disability."). Furthermore, "[w]hen Tim . . . said that [Yelder] had a disability, he looked at [Yelder] and [Yelder] shook his head no." R.

Doc. 91-2, at 6. Tim's statement that Yelder had a "disability," followed by Yelder shaking his head "no," is insufficient to show that Yelder suffered from a disability that substantially limited a major life activity. *See* 42 U.S.C. § 12102(1)(A).

Finally, the government argues that Yelder's claim lacks evidence for his contention that he has a disability because the relevant portions of the completed questionnaire addressing Yelder's disabilities were not authored by a medical doctor but by Yelder's father Tim. Our review of the record supports this conclusion. During his deposition, Tim admitted that he answered the portion of the questionnaire indicating that Yelder has medical diagnoses "of [e]pilepsy, [c]omplex [p]artial, [s]eizures, and [p]ains," as well as "education records qualifying him as an individual with disabilities in [h]ealth impairment, [l]earning disability and [s]peech-[l]anguage impairment." R. Doc. 91-1, at 10. Dr. Garlinghouse could not substantiate these diagnoses.

Because Yelder failed to produce sufficient evidence that he is "disabled" within the meaning of the Rehabilitation Act, we affirm the district court's grant of summary judgment to the government on his disability discrimination claim.

## B. *Failure to Accommodate*

We have explained that

> [a]n employer commits unlawful discrimination if the employer does not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer.

*Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002) (cleaned up). "When evaluating claims of failure to provide reasonable accommodations, we apply a modified burden-

shifting analysis." *Ehlers v. Univ. of Minnesota*, 34 F.4th 655, 659 (8th Cir. 2022). As part of his facial showing, the employee must prove that he is disabled. *Id.* ("The plaintiff must first make a facial showing that he or she . . . is disabled . . . ." (internal quotation marks omitted)). For the reasons set forth *supra*, Yelder has failed to satisfy the facial showing that he is disabled. *See supra* Part II.A.[13]

C. *Hostile Work Environment*

"A hostile work environment arises when . . . conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Bell v. Baptist Health*, 60 F.4th 1198, 1204 (8th Cir. 2023) (internal quotation marks omitted). Yelder's claim for hostile work environment is also analyzed under the *McDonnell Douglas* burden-shifting framework. *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004). To establish a prima facie claim for hostile work environment, Yelder must show the following: (1) he "was a member of a protected group"; (2) he was subjected to "unwelcome harassment"; (3) there was "a causal nexus between the harassment and [his] membership in the protected group"; (4) "the harassment affected a term, condition, or privilege of employment"; and (5) his "employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Bell*, 60 F.4th at 1204 (internal quotation marks omitted).[14]

_____

[13]Because we affirm the district court's grant of summary judgment to the government on Yelder's failure-to-accommodate claim, we need not address the government's alternative argument that Yelder failed to exhaust his administrative remedies for this claim.

[14]The government does not dispute that Yelder belongs to a protected class (African-American male), and it concedes that Yelder does not have to establish the fifth element of the prima facie case "because Yelder is alleging harassment by a supervisor." Appellee's Br. at 40.

"In order to show that the harassment affected a term or condition of employment, the conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment." *Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018) (internal quotation marks omitted). "This is a twofold inquiry. First, the harassment must be sufficiently severe or pervasive to create an objectively hostile work environment." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005) (internal quotation marks omitted). "Second, if the [employee] does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment." *Id.*

To satisfy the objective prong of the inquiry, the conduct "must be more than merely offensive, immature or unprofessional; it must be extreme." *Id.*; *see also EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 687 (8th Cir. 2012) ("[M]erely rude or unpleasant conduct is insufficient to support a claim for hostile work environment." (internal quotation marks omitted)). If the conduct "does not exceed the threshold of severity," then the employee has failed "to create a prima facie case of . . . harassment." *Kratzer*, 398 F.3d at 1047. "Title VII is not a general civility code for the American workplace." *CRST Van Expedited, Inc.*, 679 F.3d at 687 (cleaned up). It "was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Kratzer*, 398 F.3d at 1047 (internal quotation marks omitted). A court must examine "all the circumstances" to determine "[w]hether an environment is hostile or abusive." *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Such circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Blomker v. Jewell*, 831 F.3d 1051,

1057 (8th Cir. 2016) (internal quotation marks omitted). "The stringent hostile work environment standard is designed to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language and occasional teasing." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) (cleaned up), *abrogated in part by Torgerson*, 643 F.3d at 1058 (Appendix).

Here, Yelder argues that the following conduct constitutes severe or pervasive conduct: (1) Parker ripping up his leave request form for vacation leave in 2019; (2) Ring, Messina, or Parker, "harass[ing]" Yelder about needing a doctor's note each time he called in to take a sick day, R. Doc. 91-7, at 32; (3) Parker scheduling Yelder to work weekends and night shifts; (4) Parker "calling [him] lazy, telling [him that he] w[as] moving too slow, [and] telling [him] to get a job at Walmart in a demeaning tone," R. Doc. 101-2, at 46; and (5) Parker telling staff during group meetings and Yelder during individual meetings to put tissue in their ears for failure to listen. We hold that this conduct—either individually or collectively—fails to satisfy the demanding standard that our case law has established for showing severe or pervasive conduct. The conduct occurred over a period of 20 months. And although Parker's comments were insensitive and offensive, they do not rise to the level of hostile or severely abusive.[15]

---

[15]*See, e.g.*, *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 937–41 (8th Cir. 2010) (holding African-American employees established a genuine issue of material fact on their hostile work environment claim based on the following facts: "white employees routinely refused to work with African-American employees," including comments such as a supervisor saying, "[o]h, that's not going to happen," when a white employee was going to be assigned to work with an African-American employee and being told that a certain employee "don't [sic] want to work with black people"; "racial graffiti appeared in several locations" on company premises; "'KKK' and 'I hate n****rs' were carved into a workbench in the employees' locker room," and "KKK" was also carved into work lockers; racial slurs were written on the walls and stalls of the bathroom, including the word "n****r"; a railcar had the words "hang a n****r today" painted on its side; "kill the n****rs" and "f**k n****rs"

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

were painted alongside swastikas on railcars; several white coworkers exhibited Confederate flags and other racial emblems at work; white coworkers made false accusations of safety violations against African-American employees; plaintiff had a shuttle accident and was immediately sent for drug testing and suspended, actions that did not occur when a shuttle operated by a white employee experienced the same accident; plaintiff was called to work an overtime shift because a white coworker refused to work with an African-American employee, saying "I told you I wasn't going to work with that n****r"; white coworker stated "I hate them damn n****rs" and falsely reported unsafe behavior from plaintiff; white coworker told plaintiff, "[n]****r, go down there and throw the switch"; white coworker told plaintiff, "I told your black ass I wasn't going to do it"; white coworker called plaintiff "a large black male"; white coworker said "I'm going to get you canned, n****r"; and white coworker, in response to a question, said that he did not like black people).