# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 22-2808

———————————————

Roby Anderson

*Plaintiff - Appellant*

v.

KAR Global, doing business as Adesa Missouri, LLC

*Defendant - Appellee*

———————————

Appeal from United States District Court
for the Western District of Missouri - Kansas City

———————————

Submitted: June 13, 2023
Filed: August 25, 2023

———————————

Before GRUENDER, ARNOLD, and KELLY, Circuit Judges.

———————————

KELLY, Circuit Judge.

Roby Anderson appeals the district court's adverse grant of summary judgment on his claims that his former employer, ADESA Missouri, LLC (ADESA), discriminated and retaliated against him in violation of the Americans with Disabilities Act (ADA). Because we conclude that Anderson produced sufficient evidence to raise a genuine issue of material fact as to whether ADESA's reasons

for terminating him were pretext for disability discrimination and retaliation, we reverse.

## I. Background

Anderson began working for ADESA, a KAR Global company, as an Outside Sales Representative in February 2018. In that role, Anderson was required to travel for approximately 3.5 days per week to recruit new business. Anderson's job duties involved both recruiting new business ("hunting") and maintaining existing customer accounts ("farming"). ADESA recruited Anderson primarily for his skills as a "hunter," as he was hired to take over a region where ADESA lacked a sales presence.

In 2019, ADESA began merging its sales team with TradeRev, another KAR Global company. New sales territories were drawn, more than 300 members of the sales teams were reviewed, and approximately fifty sales-related positions were eliminated in a reduction-in-force (RIF). As part of the restructuring, ADESA determined that the Outside Sales Representative role would be realigned into two separate positions: Senior Dealer Solutions Executives (SDSEs), primarily responsible for hunting, and Dealer Solutions Executives (DSEs), primarily responsible for farming. Leading up to the merger, Anderson discussed the new roles with his supervisors. Anderson's general manager, Kevin Rhoads, told him that he envisioned Anderson in a hunter role going forward. Rob Peterson, the assistant general manager, spoke with Anderson about whether he would be interested in an expanded hunter role post-merger. Anderson's hiring manager and Regional Sales Director at TradeRev, Lindsey Comer, told him that she thought he would like his new role as a hunter.

On Saturday, November 16, 2019, Anderson suffered a seizure. Anderson's doctor instructed him not to operate a motor vehicle for six months following the seizure. Anderson returned to work the following Monday, November 18. He reported the seizure to his supervisors and provided them with documentation from

his doctor stating that he was temporarily unable to drive but could perform all other functions of his job. Anderson, his supervisors, and human resources (HR) personnel developed an accommodation plan, which modified his role so that he could work in the office three days a week, and an Inside Sales Representative would drive him to his appointments the other two days.

However, about one week later, Comer informed Anderson that they would not be able to continue with the accommodation plan. Anderson then proposed an alternative accommodation that would allow his father-in-law to drive him to work appointments. Anderson never received a response regarding this proposal; nonetheless, ADESA continued with the initial accommodation plan until Anderson's termination.

On November 26, 2019, Anderson sent Comer a text message asking if his driving restriction was going to be an issue. Comer responded, "I have no clue, I sure hope not though. I just know I have to disclose that to my boss and HR from what Kevin [Rhoads] told me." Rhoads had advised Comer to let Hopkins know about Anderson's driving accommodation because, as the Vice President of Sales for TradeRev, Hopkins would be the person responsible for approving accommodations going forward.

In a phone call that same day, Comer told Hopkins about Anderson's driving restriction and his need for an accommodation. At the time, Hopkins had never met Anderson, she did not have any criticisms of his performance, and Anderson had not yet been identified for termination. Then, on an unknown date between November 26 and December 6, Hopkins sent a text message to Rhoads asking him to tell her about Anderson and if he was "good or no." Rhoads responded that Anderson was a "[g]ood hunter but not the best at relationship building. He has gotten better in that area recently but could still use some work on it. In a pure hunter role though I think he would be pretty darn good." Rhoads did not provide any other input to Hopkins beyond this text message, and he only had one brief conversation with

-3-

Hopkins related to Anderson's employment—when Hopkins told him that Anderson had been earmarked for termination.

Shortly thereafter, on December 6, Hopkins emailed HR Representative Marty Nowlin for advice about Anderson. In her first email, Hopkins mentioned only that Anderson had a "medical restriction where he cannot drive for 6 months" and that he had been "identified" for termination. Hopkins asked, "Will this be an issue?" Nowlin responded that it could be, as Comer and Rhoads had "pushed hard" to accommodate Anderson because "he was a high performer." Nowlin told Hopkins that it would be helpful to understand what had changed so that they could "be better equipped" for their "course of action."

Hopkins responded that she received feedback that Anderson was best at closing deals, and that he did not like to manage the details. She quoted Rhoads's comment that Anderson was a "[g]ood [h]unter but not the best at relationship building." She also stated that they had "identified a stronger SDSE in every territory that would be reasonable for [Anderson] to cover," and that although they had one DSE position available, that role would not be suited to Anderson's strengths. Nowlin replied that the termination would be "defendable based on the role change, the unreasonable nature of accommodation and his skill set."

Then, on December 18, 2019, ADESA terminated Anderson's employment. During his termination meeting, Anderson was told that he was being let go because ADESA did not have a hunter role for him, and his sales numbers were lower than the three other employees in his position.

The decision to terminate Anderson's employment was made by Comer and Hopkins. During her deposition, Comer testified that after the merger of the ADESA and TradeRev sales teams, they had one more salesperson than necessary in Anderson's sales region. She said Anderson was selected for termination because at the time, everyone had exceeded their sales goals except for him. Comer also noted that two customers had expressed that they did not "mesh" well with

Anderson. Hopkins testified that employees were evaluated based on their skill sets, performance numbers, and organizational fit for the new job descriptions. Based on the employees' annual performance goals, she said that others "performed higher" than Anderson. According to Comer, KAR Global was trying to complete the RIF by January 2020.

Anderson sued ADESA, alleging that he was unlawfully terminated because of his disability and in retaliation for requesting an accommodation. The district court granted summary judgment in favor of ADESA, concluding that Anderson failed to establish a prima facie case of discrimination and retaliation because he failed to show a causal connection between his disability or accommodation request and his termination. This appeal followed.

## II. Discussion

"We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to . . . the nonmoving party." Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013). "Summary judgment is appropriate if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)).

The ADA prohibits employers from discriminating against employees on the basis of disability. 42 U.S.C. § 12112(a). The ADA also prohibits employers from retaliating against employees for engaging in a statutorily protected activity, which includes requesting an accommodation. 42 U.S.C. § 12203(a); Heisler v. Metro. Council, 339 F.3d 622, 632 (8th Cir. 2003) (requesting accommodation is protected activity). When there is no direct evidence of discrimination or retaliation, the plaintiff may establish an inference of discrimination or retaliation under the burden-shifting framework provided by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Canning v. Creighton Univ., 995 F.3d 603, 614-15 (8th Cir. 2021).

Under this framework, the first step for a plaintiff is to establish a prima facie case. "To establish a prima facie case of discrimination, [a plaintiff] 'must demonstrate that (1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability.'" Higgins v. Union Pac. R.R. Co., 931 F.3d 664, 669 (8th Cir. 2019) (quoting Cody v. Prairie Ethanol, LLC, 763 F.3d 992, 996 (8th Cir. 2014)). "A prima facie case of retaliation requires the plaintiff to show (1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection between the two." Moses v. Dassault Falcon Jet-Wilmington Corp, 894 F.3d 911, 924 (8th Cir. 2018) (alteration in original) (quoting Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016)). If the plaintiff succeeds at the prima facie stage, "[t]he burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action." Oehmke, 844 F.3d at 755. The burden then shifts back to the plaintiff "to show that the proffered reason was, in reality, a pretext for discrimination." Id.

The district court determined that Anderson established the first two elements of a prima facie case of discrimination and retaliation, and the parties do not contest these issues on appeal. The district court concluded, however, that Anderson failed to establish an inference that his disability and accommodation requests were causally connected to his termination. We thus focus our analysis on causation. In the disability discrimination context, we have held that a "temporal connection can demonstrate a causal link between an adverse employment action and the employee's disability." E.E.O.C. v. Prod. Fabricators, Inc., 763 F.3d 963, 969 (8th Cir. 2014). As to retaliation, we have held that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). "Temporal proximity between the protected conduct and adverse action 'must be very close' for timing alone to be sufficient." Lors v. Dean, 746 F.3d 857, 865 (8th Cir. 2014) (quoting Sisk v. Picture People, Inc., 669 F.3d 896, 900 (8th Cir. 2012)).

The parties agree that the decision to merge ADESA and TradeRev was made prior to Anderson's seizure. But, as Anderson points out, a general plan for staff reassignments after a merger is distinct from a specific decision to terminate any particular employee. And it is undisputed that the decision to terminate Anderson was made *after* his seizure. Viewing the evidence in the light most favorable to Anderson, the record here shows that Anderson had discussions with his supervisors regarding his potential post-merger role as a hunter. He then had a seizure on November 16. After Anderson informed his direct supervisors of his driving restriction on November 18, they initially "pushed hard" to accommodate him and developed a temporary accommodation that allowed him to keep working. However, Anderson was soon told that the accommodation would not work going forward. Then, when he proposed an alternative plan, he received no response from the company.

On November 26, Comer told Anderson that she "sure hope[d]" his driving restriction would not be an issue. That same day, Comer told her supervisor, Hopkins, about Anderson's driving restriction and accommodation requests. At that time, Hopkins had no criticisms of Anderson's performance and no decision had been made to terminate him. However, by December 6—ten days after Hopkins learned of Anderson's disability and accommodation requests—Hopkins had identified Anderson for termination.

Drawing all reasonable inferences in Anderson's favor, a jury could conclude that Hopkins, the new head of the chain-of-command, was the primary decisionmaker. And the jury could find that ADESA's attitude toward Anderson changed only after Hopkins became aware of Anderson's disability. Thus, for the purposes of determining the temporal proximity between Anderson's disability and accommodation request and his termination, we base our analysis on the ten-day interval between when Hopkins first learned of Anderson's disability (November 26) and when she first indicated that Anderson had been identified for termination (December 6). Cf. Lissick v. Andersen Corp., 996 F.3d 876, 886-87 (8th Cir. 2021) (in determining whether temporal proximity demonstrates causation necessary to

-7-

support Family Medical Leave Act (FMLA) retaliation claim, court looks to date employer knew of employee's use or planned use of FMLA leave, not date that leave ended).

We have held that an employer's decision to terminate an employee within a "matter of weeks" of learning of the employee's potentially debilitating condition was sufficient to establish a prima facie case of disability discrimination. See Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (holding a "matter of weeks" was sufficient proximity to establish a prima facie case of disability discrimination, but not to show pretext). In the retaliation context, although we have "refrained from 'draw[ing] a definitive line,' we have recognized that '[m]ore than two months is too long to support a finding of causation without something more.'" See Lors, 746 F.3d at 865-66 (alteration in original) (quoting Sisk, 669 F.3d at 901). We have also held that a two-week interval is sufficient to establish causation for purposes of establishing a prima facie case, "but barely so." See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (holding two-week interval was sufficient proximity to establish prima facie case, and noting this holding was consistent with overarching philosophy of McDonnell Douglas system of proof, which requires only minimal showing before requiring employer to explain its actions). Here, the interval was ten days. That is sufficient to establish causation based on temporal proximity at the prima facie stage for Anderson's disability discrimination claim and his retaliation claim.

We next turn to whether ADESA has proffered a legitimate, non-discriminatory, and non-retaliatory reason for Anderson's termination. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Floyd v. Mo. Dep't of Soc. Servs., Div. of Fam. Servs., 188 F.3d 932, 936 (8th Cir. 1999). ADESA explained that: it implemented a RIF following the merger and the restructuring of its sales team; Anderson's sales region had one more "hunter" than necessary; Anderson was selected for the RIF because his sales numbers were the lowest among his peers and because two customers had complained that they did not "mesh" with

him; and although there was a "farmer" position available, Anderson's skillset was more closely aligned with a "hunter" position. These proffered explanations satisfy ADESA's burden under step two of the McDonnell Douglas framework. See Rahlf v. Mo-Tech Corp., Inc., 642 F.3d 633, 638 (8th Cir. 2011) (concluding RIF was legitimate, nondiscriminatory justification for layoffs).

Turning to pretext, we have recognized several ways a plaintiff may create a genuine issue of material fact regarding whether an employer's proffered explanation is pretext for discrimination. One of those ways is "by persuading the court that a prohibited reason more likely motivated the employer." Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (citation omitted) (cleaned up). "Though the burden is on the plaintiff to provide evidence of pretext, to survive summary judgment she need not definitively prove that her employer's reason for firing her was pretextual—rather, she simply must 'adduc[e] enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" Hairston v. Wormuth, 6 F.4th 834, 843 (8th Cir. 2021) (alteration in original) (quoting Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012)).

Anderson argues that a reasonable jury could determine that Hopkins made the decision to terminate Anderson because of his medical restriction, and only retroactively claimed a performance-based concern after HR advised her that terminating an employee due to his disability could be "an issue." We agree. Before his seizure, Anderson had only positive feedback about his role post-merger. And after his seizure, Anderson's supervisors "pushed hard" to accommodate him. By December 6, however, ADESA had changed course regarding Anderson. The evidence shows that Hopkins sent an email to HR about an employee with a "medical restriction" who had been "identified" for termination, asking if this could be "an issue." Only after she learned that it could be a problem did Hopkins respond with specific criticisms of his performance. ADESA argues that, because Anderson does not dispute he was underperforming compared to his peers, there can be no pretext. But neither Comer nor Hopkins was able to say when they took these performance assessments into consideration. A reasonable jury could conclude that Hopkins

looked into Anderson's job performance only after she learned of his disability and accommodation request and had decided to terminate him.

Drawing all reasonable inferences in Anderson's favor, Anderson has raised genuine doubt as to ADESA's proffered reasons for his termination. "Because the employer's 'motive and intent are at the heart of a discrimination case,' the central inquiry 'is whether [disability] was a factor in the employment decision *at the moment it was made*.'" E.E.O.C. v. Wal-Mart Stores, Inc., 477 F.3d 561, 570 (8th Cir. 2007) (alteration in original) (emphasis in original) (quoting Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 403 (1st Cir. 1990)). "An employer is prohibited from inventing a '*post hoc* rationalization for its actions at the rebuttal stage of the case.'   Therefore, unless the employer articulates a legitimate, nondiscriminatory reason for [terminating] the plaintiff that '*actually* motivated the decision, the reason is legally insufficient.'" Id. (emphasis in original) (citations omitted) (quoting Sabree, 921 F.2d at 404)).  A reasonable jury could conclude that Hopkins was unaware of Anderson's professional shortcomings at the time she first identified him for termination, and thus this post hoc rationale could not have factored into her termination decision.[1]

## III. Conclusion

Because there remains a genuine issue of material fact as to whether ADESA's proffered reasons for Anderson's termination were pretext for discrimination and retaliation, the judgment of the district court is reversed and remanded for further proceedings.

_____

---

[1]The parties dispute whether the but-for causation standard outlined in Bostock v. Clayton County, 140 S. Ct. 1731 (2020) applies to ADA cases.  Because we conclude that Anderson has produced sufficient evidence to raise genuine doubt as to the legitimacy of ADESA's motive, we decline to address this question.