# United States Court of Appeals
## For the Eighth Circuit
_____

No. 25-1200
_____

Jason Schmit

*Plaintiff - Appellant*

v.

Trimac Transportation, Inc.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of South Dakota - Western
_____

Submitted: October 22, 2025
Filed: April 9, 2026
_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

Jason Schmit sued Trimac Transportation, Inc. for disability discrimination, retaliation, a hostile work environment, and wrongful termination or constructive discharge in violation of the Americans with Disabilities Act and South Dakota state

law. The district court[1] granted Trimac's motion for summary judgment. We affirm.

## I. Background

We recite the facts in the light most favorable to Schmit. *PPS, Inc. v. Faulkner County*, 630 F.3d 1098, 1100 (8th Cir. 2011). Schmit drove truck for Trimac out of its Rapid City, South Dakota terminal from May 2017 to August 2021. He was diagnosed with Parkinson's disease in December 2018. After his diagnosis, Trimac informally accommodated Schmit by assigning him to haul rock and coal, which made loading easier because it didn't require climbing on a ladder, pulling hoses, or making connections. Trimac also agreed that Schmit's trailer would be washed out after each trip by National Tank Service (NTS); that he could have a five-day workweek, with work ending each day by 1:00 p.m. (Schmit performed better earlier in the day); and that he could "haul light" when he wasn't feeling well. "Hauling light" involved transporting 117,000 pounds or less, which meant he could drive on the interstate in Wyoming, shortening his trips.[2]

In March 2021, Trimac hired Gene Williams as the new Rapid City terminal manager. Williams told Schmit he'd reached out to Trimac's Human Resources department about Schmit's disability and the "limited" amount of work he could perform. HR requested that Schmit provide information and complete a formal "Request for Reasonable Accommodation." Schmit eventually responded with his doctor's contact information and an explanation that he did not "need any additional

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

[2]Trucks can haul up to 160,000 pounds on the interstate in South Dakota, but only 117,000 in Wyoming. So if a Trimac employee is "hauling heavy," *i.e.*, more than 117,000 pounds, he needs to exit the interstate at the Wyoming border, stop at the port of entry to be weighed in, and take the state highway to his final destination, adding about an hour round trip.

accommodations other than what [he had] already informally received the last two years." Those accommodations were approved and memorialized in May as follows:

1) assigned to rock/coal loads; 2) no climbing of ladders; 3) no handling of hoses; 4) trailer washout handled by NTS; and 5) a 5-day work week, with the workday ending by 1:00 p.m.

In June, NTS's shop manager told mechanics to stop hooking up trailers to the trucks. Schmit could not perform this task because it required climbing a ladder. When Schmit approached Williams about the issue, he reportedly smirked. Around the same time, Williams told HR that Schmit wasn't "hauling heavy." Trimac expected Schmit to haul heavy when assigned heavy-duty trailers and to coordinate with dispatch about when he wanted to haul light so the trailers could be switched out. Instead, Schmit would sometimes haul light with heavy trailers. Schmit told HR that he couldn't predict when he'd feel well enough to haul heavy until he started his day around 3:00 a.m., before Williams or dispatch were available. He acknowledged that Williams suggested switching him to a light trailer on a regular basis, but he didn't want to because hauling heavy paid more. Schmit noted he "was always ok to haul a lighter load with the same [heavy] trailers" in the past.

In July, Schmit's dash camera recorded him running a stop sign. Williams reprimanded him. Later that month, Schmit and a non-disabled driver were reported for hauling heavy on the interstate in Wyoming. Both admitted the violations, and Williams gave them written warnings. The day he received that warning, Schmit emailed HR that there was "full[-]fledged targeting and harassment going on." He complained, among other things, about being monitored remotely by GPS, being called unnecessarily afterhours, and being instructed to use an air pressure gauge to check the tires during pre-trip inspection, which his disability made difficult or impossible to do, instead of a hammer test (also known as "thumping tires").

HR investigated and concluded that Schmit's concerns all involved "holding Schmit accountable for compliance with Trimac's established rules of conduct,

policies, and/or practices." They told Schmit that they believed they'd "conducted a fair and thorough investigation into [his] concerns" and, based on that investigation, they were "unable to substantiate adverse action taken against [him] by Gene [Williams]," but invited him to provide additional information or concerns. He did not respond.

In early August, Williams told Schmit that he needed to do things "his [] way," or he'd get rid of him "one way or another." After that, Disability Rights South Dakota sent a letter to Trimac's HR on Schmit's behalf, requesting continued approval of his existing accommodations and two new ones: (1) that tasks involving getting down on the ground and back up again, including pre- and post-trip inspections, be performed by others; and (2) that he haul light loads so he wouldn't need to switch trailers or travel longer routes. HR told Schmit that his existing accommodations would remain in place but denied his additional requests.

HR explained that pre- and post-trip inspections are required by the Department of Transportation and that federal regulations hold the drivers responsible for defects with the equipment that should have been identified and documented in the trip inspection. Trimac would not allow another employee to take on the liability of inspecting equipment—it was "the sole responsibility" of the driver. HR further explained that "aside from being unlawful" the requested accommodation would also be an undue hardship because it "would require another employee to be present at the same times Mr. Schmit starts and ends his work day." HR also told him that it was "an essential function of the position for Mr. Schmit to haul heavy loads, and occasionally haul light loads, in order to meet the customer's demands, and for the driver to meet the directions from dispatch." Assigning exclusively light loads to Schmit, they said, would be an undue hardship because it would hurt Trimac's revenue, negatively impact customers, and prevent "fair and equitable" distribution of dispatches among drivers.

The next day, Saturday, August 7, Schmit removed his personal belongings from his truck at the Rapid City terminal and told an employee that "he was done

with this F'ing place," "that he [was] not going to put up with it anymore," and that "he [was] done and he was leaving." Schmit did not report to work on August 9. Trimac sent him an email purporting to "accept his resignation" on August 10. Schmit denies that he resigned and says that dispatch told him his truck was in for service, that he would be told when it was done, and that if he didn't get a call by Monday morning, he didn't need to come in. He tried to log into the Trimac Employee Portal over the prior weekend, but was denied access. On August 12, Schmit emailed HR confused about why he hadn't heard back about his truck and asking if he'd been fired. HR referred him to their August 10 email. On August 13, Schmit's attorney notified Trimac that he was claiming wrongful termination.

On August 18, Schmit applied for total social security benefits. He wrote: "I became unable to work because of my disabling condition on August 7, 2021." In his disability report, he stated that he stopped working "[b]ecause of [his] condition(s)." On September 13, he submitted a "Function Report" where he elaborated:

> I am unable to climb, only stand for a limited time, difficulty walking, I have muscle stiffness, decreased coordination, and increased tremors throughout the day. The inability to control my right hand, arm, right leg & foot make it impossible to work. I am unable to write for documentation. At times I have hallucinations & delusions due to my medication I take for my Parkinson's disease.

He testified that the information he provided was true and accurate. The Social Security Administration (SSA) approved Schmit's application, finding he became disabled on August 7, 2021.

Schmit then sued Trimac for disability discrimination, a hostile work environment, retaliation, and wrongful termination and/or constructive discharge claims under the ADA and South Dakota state law. The district court dismissed his disability discrimination, retaliation, and hostile work environment state law claims for failure to exhaust state administrative remedies. Trimac moved for summary

-5-

judgment on the remaining claims. The court found that there were genuine disputes of material fact whether Schmit resigned or was fired, whether Trimac had a "discriminatory attitude" toward Schmit, and whether Schmit was fired due to his disability. But it granted the motion, largely because of Schmit's inconsistent representations about his disability in his application to the SSA and in this suit. On appeal, Schmit argues that his statements to the SSA do not bar recovery and genuine disputes of material fact prevent resolution of this case on summary judgment.

## II. Standard of Review

We review an order granting summary judgment *de novo,* "viewing the evidence and drawing all reasonable inferences in the light most favorable to . . . the nonmoving party." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023) (quoting *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)). We may affirm based on any grounds supported by the record. *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to their case. *Id.* at 844. Failure to do so "renders all other facts immaterial" and entitles the moving party to judgment as a matter of law. *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III. Discrimination

The ADA prohibits discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination, Schmit must demonstrate that he (1) is a disabled person as defined by the ADA, (2) is qualified to perform the essential functions of his job with reasonable accommodations as needed, and (3) suffered an adverse employment action because of his disability. *Anderson*, 78 F.4th at 1036. Schmit is only "qualified" if he: "(1) meets the necessary prerequisites for the job, such as education, experience, and training; and (2) can perform [his] essential job functions,

with or without reasonable accommodation." *Gilmore v. AT & T*, 319 F.3d 1042, 1047 (8th Cir. 2003).

Schmit is disabled, and we assume without deciding that he's met his prima facie burden to show that he suffered an adverse employment action, namely, that he was fired.[3] *See Hill*, 737 F.3d at 1219 ("Termination, of course, is an adverse action"). But like the district court, we think that Schmit failed to show that he is a qualified individual. Schmit told the SSA, and so conceded, that he suffered from debilitating Parkinson's symptoms, from serious medication side effects, and that it was "impossible" for him to work because of his condition. To be sure, "[s]tatements to the SSA to secure disability benefits do not automatically preclude a successful suit under the ADA." *Lane v. BFI Waste Sys. of N. Am.*, 257 F.3d 766, 769 (8th Cir. 2001) (citing *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999)). But Schmit needs to "proffer a sufficient explanation" for the "apparent contradiction" between his previous statements and his present litigation position. *Cleveland*, 526 U.S. at 806; *see also id.* at 807 ("To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'").

Schmit argues there is no contradiction because he could truthfully say he was "unable to work" on August 7, for social security purposes, even though he was able to work with reasonable accommodations and was thus a "qualified individual." We agree that a plaintiff may be "qualified" under the ADA—because he can perform his job "with reasonable accommodation"—and disabled for social security purposes—because the SSA doesn't "take the possibility of 'reasonable accommodation' into account." *Cleveland*, 526 U.S. at 803; *see also id.* (a social

---

[3]For that reason, we do not consider his alternative theory that he was constructively discharged, except as noted *infra*, Section VI, or whether the contemporaneous partial denial of his accommodation requests is another adverse action.

security disability insurance applicant needn't "refer to the possibility of reasonable accommodation when she applies"); *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009) (plaintiff wasn't "incapable of performing the essential functions of his job," but was disabled for Social Security purposes, because "there [were] not a significant number of jobs in the national economy that he could perform" considering "his age, education, work experience, and residual functional capacity").

But Schmit did not just say he has a disability. Nor that he was merely "unable to work." He swore under penalty of perjury that he suffers from "hallucinations & delusions" and it was "impossible" for him to work because he couldn't "control [his] right hand, arm, right leg & foot." "[A] person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry." *Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005); *see also Cleveland*, 526 U.S. at 802 (distinguishing "purely factual statement[s]" from an "SSA representation of total disability . . . [which] often implies a context-related legal conclusion). That Schmit's treating physician believed he could work with unspecified accommodations in place when she saw him on August 18, the same day Schmit applied for total social security benefits, does not explain how Schmit could make these factual representations in good faith and perform the essential functions of his job. *See Cleveland*, 526 U.S. at 807.

Schmit argues in the alternative that there is no contradiction between what he told the SSA and his current litigation position because he wasn't disabled for social security purposes before his termination—his condition only worsened after he was fired. *See Finan*, 565 F.3d at 1079 (SSA determination that plaintiff was disabled, but not disabled prior to his termination, "sufficiently explained any apparent contradiction between his Social Security and ADA claims"). But Schmit's representations to the SSA established that he was disabled on August 7. If Trimac fired Schmit, as he claims, a reasonable juror could not find it did so any earlier than August 10, when Trimac told him it was "accept[ing] his resignation."

IV. Hostile Work Environment

To prevail on his ADA hostile work environment claim, Schmit must show that (1) "he is a member of the class of people protected by the statute;" (2) "he was subject to unwelcome harassment;" (3) "the harassment resulted from his membership in the protected class;" and (4) "the harassment was severe enough to affect the terms, conditions, or privileges of his employment." *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012) (quoting *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003)). We assess whether harassment affects a term, condition, or privilege of employment based on "the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [the employee's] job performance." *Id.* at 779 (quoting *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010)).

Schmit rests his hostile work environment claim on a few discrete interactions with Williams—their first meeting, when Williams referenced the "limited" amount of work Schmit could do, and the time he told Schmit, shortly before the end of his time at Trimac, that he was going to get rid of him—along with an asserted but unelaborated pattern of "berating" him for months before firing him. As to the former, we are not convinced that these "isolated incidents" are "extremely serious" or "amount to discriminatory changes in the terms and conditions of employment." *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir. 1998) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "[S]poradic use of abusive language" does not rise to the level of actionable harassment. *Id.* (quoting *Faragher*, 524 U.S. at 788). As to the latter, Schmit has failed to corroborate his allegation with citations to the record, *see* Fed. R. App. P. 28(a)(8)(A), and our independent review has not uncovered "severe or pervasive" conduct linked to Schmit's disability. *Wallin*, 153 F.3d at 688 (quoting *Faragher*, 524 U.S. at 786). The "ordinary tribulations of the workplace" described above—smirking, unwanted afterhours phone calls, and discipline for failing to follow the law and company

policy—do not give rise to an actionable hostile work environment. *Id.* (quoting *Faragher*, 524 U.S. at 788).

## V. Retaliation

To establish a prima facie case of retaliation, Schmit must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014).

Schmit has not met his burden on the last element. He argues that it was "only a few months" between when Williams started working and when he (Schmit) was fired. And, on reply, that "shortly" after Williams was hired his accommodations were "halted." Both arguments fail for the same reason: the requisite causal link must be between an adverse action—whether termination or the end of his accommodations[4]—and a statutorily protected activity. *Id.* Contrary to what Schmit seems to suggest, Williams's appointment as terminal manager isn't a protected activity. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter.").

And though we do think that Schmit's request to continue his previous informal accommodations was statutorily protected, *see Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 908 (8th Cir. 2010), the "temporal connection" between his request in April and his termination in August alone is inadequate to present a genuine factual dispute. *See Anderson*, 78 F.4th at 1037 ("Temporal proximity between the protected conduct and adverse action 'must be very close' for timing alone to be sufficient." (quoting *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014)));

---

[4]Though it's not clear what accommodations Schmit is referring to—there is no evidence in the record that the accommodations he'd informally received prior to Williams' arrival at Trimac, which were memorialized shortly after his arrival, were ever revoked.

*see also Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (two-week interval sufficient, "but barely so").[5]

## VI. Wrongful Termination

Schmit's final asserted claim is wrongful termination or constructive discharge under state law. Constructive discharge is not a free-standing cause of action, but counts as "termination" for the purpose of a wrongful termination claim under South Dakota law. *See Niesent v. Homestake Min. Co. of Cal.*, 505 N.W.2d 781, 783 (S.D. 1993); *see also Johnson v. Kreiser's, Inc.*, 433 N.W.2d 225, 228 (S.D. 1988) (recognizing "a cause of action for wrongful termination under the public policy exception to the at-will doctrine"). A claim for wrongful termination arises where the motivation for an employee's termination "contravenes a clear mandate of public policy." *Niesent*, 505 N.W.2d at 783. To state a claim, an employee "must plead and prove that a substantial public policy may have been violated." *Id.* "Public policy is found in the letter or purpose of a constitutional or statutory provision or scheme, or in a judicial decision." *Id.*

Schmit has not pleaded and proven the existence of any public policy, nor has he directed us to a judicial decision,[6] constitutional provision, or statutory scheme where we can find one. And borrowing the statutory scheme from his other claims won't do; the South Dakota Supreme Court has expressly declined to recognize a public policy exception for discharge based on a disability. *See Matta v. Dakota Provisions*, 15 N.W.3d 448, 457 (S.D. 2024) ("[T]here is no need to create a common law tort remedy when the [l]egislature has created robust statutory

---

[5]Schmit does not argue about the timing of the August letter and his termination. *See SEC v. Quan*, 817 F.3d 583, 590 (8th Cir. 2016) (arguments not raised on appeal are forfeited).

[6]He cites *Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 732 (8th Cir. 1996), but that case only explains the conditions that give rise to constructive discharge, not what "clear mandate of public policy" was "contravene[d]" by his termination. *See Niesent*, 505 N.W.2d at 783.

remedies for an employee whose employment has been adversely impacted because of a disability, or other recognized protected status under SDCL chapter 20-13"); *see also id.* at 457 n.5 (noting that S.D. Codified Laws § 20-13-10 is comparable to the ADA and citing *Huck v. McCain Foods*, 479 N.W.2d 167, 169 (S.D. 1991)).

## VII. Conclusion

Affirmed.

_____